1 KAMALA D. HARRIS, State Bar No. 146672
Attorney General of California
2 FIEL D. TIGNO, State Bar No. 161195
Supervising Deputy Attorney General
3 MICHAEL D. GOWE
Deputy Attorney General
4 State Bar No. 226989
  1515 Clay Street, 20th Floor
5   P.O. Box 70550
  Oakland, CA  94612-0550
6   Telephone:  (510) 622-2201
  Fax:  (510) 622-2121
7   E-mail:  Michael.Gowe@doj.ca.gov
*Attorneys for Defendant Board of Trustees of the*
8 *California State University*

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

SAN FRANCISCO DIVISION

12

13

| | |
|---|---|
| **LINDA ELLIS,** | C-15-02273-TEH |
| Plaintiff, | **DEFENDANT'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PARTIAL SUMMARY JUDGMENT** |
| v. | |
| **SAN FRANCISCO STATE UNIVERSITY, et al.,** | |
| Defendants. | Date:          July 18, 2016<br>Time:          10:00 a.m.<br>Courtroom:   2<br>Judge:         Hon. Thelton E. Henderson<br>Trial Date:   N/A<br>Action Filed:  May 20, 2015 |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION/MOTION FOR PARTIAL SUMMARY JUDGMENT ............................ 1

RELIEF SOUGHT .......................................................................................................................... 1

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ............................................................................................................................. 3

    I.      The Museum Studies Program. .............................................................. 5

    II.     Discussion at the May 19, 2014 Meeting. .............................................. 6

    III.    Emails Provided to Mr. Kauffman. ........................................................ 8

    IV.   Other Information Potentially Provided to Mr. Kauffman. ................... 12

ARGUMENT ................................................................................................................................ 14

    I.      Fitness-For-Duty Examinations Are Legal Options for Employers to Take to Examine Employees Who May Be Unable to Perform Their Job Due to a Medical Condition. ........................................................................... 14

    II.     Because Dr. Ellis's Examination Was Both Job-Related and Consistent with Business Necessity, the Court Should Grant Summary Judgment in Favor of the University as to  Her First and Fifth Causes of Action. ................. 17

         A.     The Examination Was Job-Related. ......................................... 17

         B.     The Examination Was Consistent With Business Necessity. ................... 19

CONCLUSION ............................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Brownfield v. City of Yakima*
   612 F.3d 1140 (9th Cir. 2010)...........................................................................17

*Cody v. CIGNA Healthcare of St. Louis, Inc.*
   139 F.3d 595 (8th Cir. 1998)............................................................................15

*EEOC v. Prevo's Family Market, Inc.*
   135 F.3d 1089 (6th Cir. 1998)..........................................................................16

*Kroll v. White Lake Ambulance Service*

763 F.3d 619 (6th Cir. 2014)..............................................................................22

*Owusu-Ansah v. Coca-Cola Co.*
   715 F.3d 1306 (11th Cir. 2013)..........................................................16, 22, 23

*Sullivan v. River Valley School Dist.*
   197 F.3d 804 (6th Cir. 1999)....................................................... *passim*

*Tice v. Centre Area Trans. Auth.*
   247 F.3d 506 (3d Cir. 2001)........................................................................16, 17

*Yin v. State of Cal.*
   95 F.3d 864 (9th Cir. 1996)..............................................................................14

**STATUTES**

42 U.S.C. § 12112...................................................................................................15

Educ. Code § 89536...............................................................................................24

Educ. Code § 89536.1(a)........................................................................................24

**OTHER AUTHORITIES**

H.R. Rep. No. 101-485 (II) ....................................................................................15

H.R. Rep. No. 101-485 (III) ...................................................................................15

Cal. Code Reg., title 5, div. 5, § 43404.........................................................3, 15, 25

**NOTICE OF MOTION/MOTION FOR PARTIAL SUMMARY JUDGMENT**

TO PLAINTIFF AND HER ATTORNEY OF RECORD:

PLEASE TAKE NOTICE THAT, on July 18, 2016, or as soon thereafter as the matter may be heard, in the United States District Court, Northern District of California, San Francisco Division, in Courtroom 2 at 450 Golden Gate Avenue, San Francisco, CA 94102, before the Honorable Thelton E. Henderson, Defendant Board of Trustees of California State University, which is the State of California acting in its higher education capacity (erroneously sued as "San Francisco State University"), will and hereby does move the Court for partial summary judgment of Plaintiff Linda Ellis's amended complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure.  This motion is based on the Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, and other related documents filed in connection with this motion, the papers and records on file in this action, and such other written and oral argument as may be presented to the Court.

**RELIEF SOUGHT**

Defendant moves the Court to grant partial summary judgment under Federal Rules of Civil Procedure, Rule 56, against Plaintiff Linda Ellis's ("Dr. Ellis") First and Fifth Causes of Action for disability discrimination by way of an allegedly "unlawful medical examination."  Because the fitness-for-duty examination required of Dr. Ellis by the University was job-related and consistent with business necessity, under the ADA and the FEHA, the Court should dismiss Ellis's First and Fifth Causes of Action with prejudice.

**INTRODUCTION**

Dr. Ellis was separated from her employment because she refused to follow the University's directive to take a mental fitness-for-duty examination pursuant to the University's regulations.  The University's directive was consistent with the ADA and the FEHA because the examination was intended to determine whether Dr. Ellis could perform her job, as Dr. Ellis's antagonistic behavior towards colleagues and student complaints about her work raised concerns about her mental fitness to fulfill her job responsibilities.  Thus, the University's examination was job related and consistent with business necessity.

1

1      Also, because Dr. Ellis never took the examination and Dr. Henderson, the psychologist

2 who was scheduled to administer it, never developed the examination, Dr. Ellis can only

3 speculate that the examination was not job-related.  The undisputed facts establish that Dr.

4 Henderson was familiar with the general job duties of faculty at San Francisco State University,

5 and had previously examined other faculty for fitness for duty in the recent past.  The evidence

6 shows that the University's retention of Dr. Henderson to examine Dr. Ellis was only for the

7 purpose of determining whether Dr. Ellis was mentally fit to continue as a professor at the

8 University.  There is no evidence to suggest that the fitness-for-duty examination was anything

9 but job-related.

10      Moreover, the University's directive to undertake the examination was consistent with

11 business necessity.  The evidence shows that the decision-maker had the good-faith belief that Dr.

12 Ellis's problems in the workplace could be due to an underlying medical reason.  The decision-

13 maker who issued the directive understood that Dr. Ellis's performance as a professor had

14 worsened to the point of numerous complaints by students and the need for various workarounds

15 by colleagues to cover her work, and that her belligerent treatment and outbursts with colleagues

16 had escalated in the preceding months to such a point that some sort of employment action was

17 necessary.  At the same time, that decision-maker understood that Dr. Ellis had recently revealed

18 that she was diagnosed with Asperger's Syndrome and that she further attributed her combative

19 behavior to that condition.  And the decision-maker was told that she had a brain tumor removed

20 a few years before, and it was unknown whether Dr. Ellis's erratic behavior was due to a

21 biological reason related to her brain surgery.  The decision-maker had also reviewed

22 documentation that appeared to independently substantiate the University's concerns and

23 conclusion that a fitness-for-duty examination was necessary for Dr. Ellis's welfare and the

24 University's legitimate business interests.

25      Faced with the real possibility that Dr. Ellis's disruptive behavior and performance issues

26 were due to a mental health condition, disclosed or as yet unknown, the University reasonably

27 decided to require that Dr. Ellis take a fitness-for-duty examination for the limited purpose of

28 determining whether she was mentally fit for the position.  As such, the fitness-for-duty

examination directive was lawful under the ADA and the FEHA.  Those civil rights statutes do not hold an employer liable for failing to have a perfect process in proceeding with a fitness-for-duty examination, if the employer's examination is job-related and consistent with business necessity.  The University should not be penalized for pursuing the reasonable option of an examination to determine if Dr. Ellis could perform her job duties, given the information it obtained concerning Dr. Ellis's medical condition, her deficient work performance and reports of aggressive behavior.  Dr. Ellis's First and Fifth Causes of Action for disability discrimination based on an allegedly "unlawful medical examination" should therefore be dismissed.

**BACKGROUND**

University administrators met on May 19, 2014 to discuss how to approach problematic workplace behavior by Dr. Ellis that had escalated in recent months.  Gowe Declaration, Ex. A, p. 17:1-7; Ex. B, p. 24:17-23; Ex. C, pp. 89:23-25 to 90:1; p. 90:20-25.   Bryan Kauffman, Director of Labor Relations and Employee Development at the University, attended the meeting and ultimately recommended that Dr. Ellis be required to undertake a fitness-for-duty examination.  Gowe Dec., Ex. A, pp. 45:10-23; 46:1-14, Ex. B, pp. 25:13-20; 31:19-25; 32:1-3, 12-15; Kauffman Dec., Ex. C.  There was no disagreement by those attending the meeting, and Dean Paul Sherwin, head of the College of Liberal and Creative Arts, approved the budget for the examination.  Gowe Dec., Ex. A, pp. 45:10-23; 46:1-14; Ex. B, p. 34:12-25.

The University is authorized to require such an examination pursuant to section 43404 of the California Code of Regulations.  *See* Cal. Code Reg., title 5, div. 5, § 43404.  Under section 43404, not only can the University investigate the fitness of an employee through an examination by an objective mental health professional, the employee is entitled to provide her own documentation to the University before it acts on the examination result.  *Id*.  This means that the employee can provide a report from a mental health professional of her own choosing, if she feels that it is necessary or will aid the University in making any subsequent decision.  Ultimately, the examination results can benefit both the University and the employee by ensuring that, as in Dr. Ellis's circumstances, the University responds to problematic workplace conduct appropriately and, ideally, in a manner that maintains the employment relationship.  For employees with mental

3

1  health impairments affecting their ability to perform their work, but who are disinclined to

2  acknowledge such limitations or seek accommodations, the fitness-for-duty results can work to

3  prompt constructive discussion with the University around potential accommodations as opposed

4  to resorting to discipline for conduct seemingly unconnected to a disability.

5      Mr. Kauffman received documentation from Dr. Ed Luby, the Director of the Museum

6  Studies Program, where Dr. Ellis was employed as a professor, regarding Dr. Ellis's erratic

7  conduct.  Gowe Dec., Ex. A, pp. 36:18-24; 37:10-25; Ex. C, pp. 90:20-23; 93:17-20; 96:6-23;

8  Kauffman Dec., Ex. A.  Following the meeting, Mr. Kauffman's office contacted psychologist,

9  Elliot Henderson, PhD, to set up an appointment for Dr. Ellis.  Gowe Dec., Ex. A, pp. 38:25; 39;

10  40:1-8.  Mr. Kauffman drafted and sent two letters to Dr. Ellis, one to explain the basis for her

11  temporary suspension and the other to set up the appointment with Dr. Henderson.  Gowe Dec.,

12  Ex. A, pp. 46:20-25; 47:1-7; Kauffman Dec., Ex. C.  Mr. Kauffman's office forwarded the

13  documentation that he received from the meeting attendees to Dr. Henderson to provide context

14  for the requested examination.  Gowe Dec., Ex. A, p. 3-8; Ex. D, p. 21:3-21.  Dr. Ellis never

15  attended an examination with Dr. Henderson, however, nor had any contact or communication

16  with him.  Gowe Dec., Ex. D, p. 26:3-14; Ex. F, p. 98:6-24.

17      After a series of suspensions for the failure to attend appointments with Dr. Henderson,

18  Provost Sue Rosser terminated Dr. Ellis's employment from the University.  Gowe Dec., Ex. G,

19  69:14-25; 70:1-24; Ex. A, pp. 82:3-24; 103:4-23; 112:19-25; 113:1-8.  Between the time she was

20  first placed on temporary suspension on May 20, 2014 to her termination, effective December 2,

21  2014, Dr. Ellis regularly communicated with Mr. Kauffman to discuss her objections to the

22  process.  In those communications, Dr. Ellis claimed that her civil rights were violated by the

23  examination, and that the University had failed to provide her with sufficient information about

24  the examination and its underlying basis.  *See, e.g.,* Amended Complaint (Doc #14) ¶¶ 38-53; 58-

25  60.

26      At the same time, Dr. Ellis had no problem with a mental health examination , per se, as she

27  volunteered to take an examination by her own healthcare provider or otherwise attempt to have

28  that provider available for questions—her objection was with the mandate that she be examined

4

by a mental health professional of the University's choosing.  *See* Amended Complaint (Doc #14), ¶ 42; Gowe Dec., Ex. I.  Mr. Kauffman, in turn, continued to direct her to take the examination with Dr. Henderson and his office rescheduled the appointment multiple times to allow her to avoid termination by complying with the directive.  *See, e.g.,* Gowe Dec., Ex. A, pp. 72:3-12; 75:3-9.

The goal of the suspensions was to encourage Dr. Ellis to comply with the directive, and, depending on the results of the examination, return her to work.   Gowe Dec., Ex. A, p. 87:16-25; 89:4-12; Ex. H, p. 28:12-15.  Mr. Kauffman had previously required mental fitness-for-duty examinations for other University professors whose work performance issues appeared to be related to a medical condition, and on each occasion, the professors were found mental unfit, but ultimately returned to work, more than once for one individual.  Gowe Dec., Ex. A, pp. 39:3-5; 41:15-23; Ex. D, pp. 29:1-22; 30:1-9; Kauffman Declaration, ¶ 5.

## I.    THE MUSEUM STUDIES PROGRAM.

Dr. Ellis is the founding Director of the University's Museum Studies Program.  Gowe Dec., Ex. F, p. 12:17-21.  It is a graduate-level program, although undergraduates were permitted to take classes offered by the program.  *See* Gowe Dec., Ex. F, p. 19:17-20.

From 1987, for 15 years, Dr. Ellis was virtually the sole professor in the program—until Dr. Ed Luby was hired into the program in 2002 from U.C. Berkeley as a tenured faculty member. Gowe Dec. Ex. F, pp. 30:21-25; 31:1-24.  In 2011, Dr. Luby transitioned into the role of Director, and Dr. Ellis transitioned into the newly created position of Senior Curator.  Gowe Dec. Ex. F, p 144:1-9.  Christine Fogarty joined the program as a staff member in 2000, and became fulltime in 2005 after having received a Master's degree from the program in 2002.  Gowe Dec., Ex. L, pp. 10-11.  Until 2014, Ms. Fogarty, and Drs. Ellis and Luby, were the only individuals employed in the program.

Dr. Luby was not Dr. Ellis's supervisor, despite his position as Director.  As tenured faculty, both Dr. Luby and Dr. Ellis retained independence from direct supervision.  The role of the Director was primarily to administer the program itself and to supervise its staff.  In this capacity, the Director reported to the Dean and Associate Dean of the College of Liberal and Creative Arts.

5

Gowe Dec., Ex. C, pp. 110-111.  For the relevant time period in this action, the Dean was Paul Sherwin, until 2014, when Daniel Benardi became Interim Dean.  Susan Shimanoff is an Associate Dean.

## II.    DISCUSSION AT THE MAY 19, 2014 MEETING.

As of the May 19 meeting, Mr. Kauffman had not met Dr. Ellis and did not know anything substantive about her.  Gowe Dec., Ex. A, p. 14:2-25; 15:1-21.  During the May 19 meeting, Mr. Kauffman took notes on his iPad of what he heard about her from the other attendees:  Dean Sherwin, Associate Dean Shimanoff, Director of the Art Department, Gail Dawson, and Dr. Luby. Gowe Dec., Ex. A, p. 17:1-24.

As the copy of his notes shows, Mr. Kauffman heard that Dr. Ellis had a brain tumor in 2010, and the University managers who attended the meeting thought that the "behaviors may have been attributable to that."  He also heard that Dr. Ellis was "[c]laiming aspergers" and that she was "[n]ot registered at the DPRC to our knowledge."  Kauffman Dec., Ex. B (AGO-1220).

During the meeting, Mr. Kauffman also noted that:  "Thought she was coming to class inebriated, medicated, being late, missing classes.  AOC [Christine Fogarty] asked to step in and work on classes" and "AOCs were asked several times to teach class.  Stressful because she worked for Linda directly.  AOC was a periodic lecturer." *Id.*

In terms of student relations, Mr. Kauffman heard from one or more of the attendees that Dr. Ellis was not fulfilling her role as a reader or chair to provide feedback and approve graduate student theses in the program. *See, e.g.,* Gowe Dec., Ex. A, p. 37:3-9.  This, in turn, created a high level of stress for these students—they needed the feedback to complete the theses and her signature was needed for the theses to be deemed final, or the students would be unable to graduate:

- "Not paying attention to theses.  Raised anxiety about not graduating.  Not getting timely feedback.  They [sic] would ask me to manage it."  Kauffman Dec., Ex. B.

The notes reference comments by, apparently, Dr. Luby, as to how he attempted to informally resolve the students' concerns while, at the same time, avoiding significant changes to Dr. Ellis's duties or role in the department:

6

- "Went through this scenaio [sic] a year ago.  Issue last summer.  Implemented workarounds then.  DIdn't [sic] put her on as many theses.  Changed classes to address her teaching deficiencies."
- "This semester she chaired 6 theses and sat on 4 more.  This was a lower percentage than in prior years."
- "Level of anxiety for students was very high.  Non-stop e-mails.  Gave tyhem [sic] a lot of advice.  Ann H[allum, Dean of Graduate Studies] found this unacceptable. She then allowed me to sign them.  I am doing all the substantive work."

Kauffman Dec., Ex. B.

Thus, Dr. Luby attempted to resolve the difficulties with Dr. Ellis by implementing "workarounds."  He lessened her duties by reducing the number of theses she had to provide feedback for, but without completely eliminating her involvement in mentoring the students. There is no evidence that Dr. Ellis protested this or otherwise questioned this reduction in the percentage of students for whom she was a reader.  The notes indicate that Ann Hallum, Dean of Graduate Studies, gave Dr. Luby emergency instructions to sign and approve student theses in lieu of Dr. Ellis, so as to avoid any student unnecessarily failing to graduate on time before summer began. Kauffman Dec., Ex. B.  Dr. Shimanoff testified that it was her understanding that similar workarounds were necessary at the same time in the previous year, due to the inexplicable failure of Dr. Ellis to timely communicate with her students and colleagues.  Gowe Dec., Ex. B, p. 29:3-14.

Mr. Kauffman's notes further detail how Dr. Ellis shouted at Dr. Luby and otherwise engaged in strange behavior—representing a shift in her work behavior:

She is a bully.  She is rude and inappropriate.  I have some e-mails which demonstrate. She didn't show for search committee meetings.  I arranged an interview for 1st candidate.  She didn't show up.  Won't respond to certain e-mails.  She then manically comes down hallway to me with candidate.  Introduces herself.  Said she didn't know about interview.  Told her that she had been informed.  She then yelled 'Shut up' at me in front of candidate.  I moved away and she continued to be over the top.  It really upset him.  Yelled it again.  Student assistant heard this as well.  She then said, you'll get yours.  This happened this spring.  First time that she ever yelled at me."

7

1
2

> More common will be that she comes in and starts yelling.  I have never yelled back.
> THen will sob.

Kauffman Dec., Ex. B.

3
4

### III.   EMAILS PROVIDED TO MR. KAUFFMAN.

Dr. Luby also provided copies of emails to Mr. Kauffman that substantiates the

circumstances described in his notes.  *See* Kauffman Dec., ¶ 2; Ex. A.

For example, Dr. Luby provided emails to him from students that describe their concerns

about the failure to receive timely feedback from Dr. Ellis, including the lack of any response

from Dr. Ellis at all and the students' fear that they would not graduate on time.  Kauffman

Declaration, Ex. A (AGO-1041 to AGO-1052).  The emails included in the batch provided to Mr.

Kauffman are from four students just before the 2014 graduation, as well as one from just before

the 2013 graduation, to illustrate the pattern of behavior by Dr. Ellis.  Kauffman Declaration, Ex.

A (AGO-1046.)  As noted in Dr. Luby's email of May 16, 2014 to Dean Shimanoff:

> I have to report that virtually all of the [twelve] students listed above contacted me in
> person or via email, especially after May 1, to express their frustration, anxiety, and
> concern about receiving timely and substantive feedback on their work from Linda.
> They felt they had to badger Linda, that it was inappropriate to be forced to contact
> her via personal cell phone and personal email multiple times, often with no response,
> resulting in a negative assessment of this phase of their time in program, an
> assessment that could be shared with other students, alum, and even prospective
> students.

Kauffman Dec., Ex. A (AGO-1042).

Earlier in the email, Dr. Luby noted that:

> In the end, according to students who had Linda on their committees, Linda signed
> several theses before she had finished her review of them.  Some students also
> received feedback too close to the deadline to be able to incorporate it into their work,
> after having made repeated appeals for a review of their material.  Some students also
> reported that they had been waiting since at least before April 1 for feedback on drafts,
> and that when feedback did arrive, it was not substantive.[1]

Kauffman Dec., Ex. A (AGO-1041).

---

[1] The lack of substance in her feedback was confirmed by Dr. Ellis in her deposition,
where she seemed to take it as a matter of pride that her feedback was primarily on grammar and
punctuation, requiring that the students merely accept her changes with a push of the button as
opposed to substantive feedback requiring thought and further analysis by the student.  Gowe
Dec., Ex. F, pp. 223:9-15; 233:4-25; 234:1-8; see also pp. 223:16-25; 224; 225; 226; 227:1.

8

1    These emails provided Mr. Kauffman with direct evidence to substantiate the concerns

2    raised by Dr. Luby and his colleagues, and contemporaneous examples of what his notes list as

3    "bullying," "inappropriate," and "rude" behavior by Dr. Ellis.  The emails from Dr. Luby also

4    indicated that the behavior may be related to a mental disability.

5    In a January 2014 email, for example, Dr. Luby describes an encounter with Dr. Ellis where,

6    after their colleagues left a meeting, Dr. Ellis "immediately became angry, confrontational, and

7    accusatory"—claiming that she had been "stabbed in the back" by Dr. Luby and that Dr. Luby

8    was mismanaging the program.  Kauffman Dec., Ex. A (AGO-1031-1032; date referenced in

9    AGO-1030).  Dr. Luby explained that he attempted to defuse the situation and end the

10   confrontation, but that a few minutes later, Dr. Ellis approached him again "weeping over the

11   course of the next 15 minutes" and "outlining very personal issues about the stress of caring for

12   her mother, her mother's terrible childhood, and her own difficult childhood."  Kauffman Dec.,

13   Ex. A (AGO-1031).  Dr. Luby further describes how Dr. Ellis revealed to him that she had been

14   diagnosed with Asperger's Syndrome, that she had told Deans Sherwin and Shimanoff the same,

15   and that the Asperger's Syndrome "accounts for why she is unable to control her temper, and why

16   she doesn't understand the impact that her words and actions have on others."  Kauffman Dec.,

17   Ex. A (AGO-1031).

18   Dr. Luby explained in the email that he told her that he "would support anything she needed

19   administratively, though she declined any assistance." The interaction ended by Dr. Ellis

20   "awkwardly asking to shake" Dr. Luby's hand, as "she was sobbing, shaking, and almost unable

21   to stand."  Kauffman Dec., Ex. A (AGO-1031).

22   Dr. Luby further noted that he had had such interactions with Dr. Ellis before:  "I've

23   experienced a version of this dynamic many times before with Linda—she is angry with me for

24   some perceived past infraction, which may be one we have already reviewed, and then she

25   manages to confront me while we are alone, in a bullying , accusatory, and negative manner."  He

26   further described how he had shifted from attempting to discuss the issues with Dr. Ellis, "but

27   now I mostly work to remove myself from the situation."  He states that "Later, as part of this

28

9

1   dynamic, she seeks me out to outline her considerable woes, almost invariably in a manner where

2   she is left weeping and barely in control of herself."  Kauffman Dec., Ex. A (AGO-1031-1032).

3        Dr. Luby stated in the email that "this is how Linda has behaved towards me over the past

4   few years" and that he is "writing now because I am newly concerned about her mental stability

5   and the fact that she is offering the diagnosis to explain her negative behavior."  Kauffman Dec.,

6   Ex. A (AGO-1032).  He further states:

7        Specifically, in revealing her Asperger's diagnosis to me, she indicated that she [is]
8        unable to control her anger in written and verbal communication, that it is deeply
         upsetting to her that colleagues and students are afraid of interacting with her, and
9        that she realizes that her negative behavior is often unforgiveable."

10   Kauffman Dec., Ex. A (AGO-1032).

11       Another email shows that, a couple of months later, Dr. Ellis approached Dr. Luby and a

12   candidate for a tenured faculty position in the program while they traversed a hallway.  Dr. Luby

13   recounts how Dr. Ellis stopped the two of them on their way to the restroom, and that she was

14   upset that the candidate had not been scheduled to arrive on a date that she apparently preferred.

15   Dr. Luby describes how Dr. Ellis proceeded to suddenly shout at him to "shut up!," in front of the

16   candidate, as Dr. Luby attempted to explain how he had worked to include her in the decision-

17   making about the timing for the candidate's visit.  Dr. Ellis, according to Dr. Luby's email, then

18   yelled a parting shot, of something to the effect of, "you'll get yours!"  Kauffman Dec., Ex. A

19   (AGO-1029).

20       Dr. Luby provided other emails between him and Dr. Ellis, to illustrate how Dr. Ellis would

21   perceive attempts to manage her administratively as an affront to her character, resulting in Dr.

22   Luby's further disinclination to engage her in dialogue about the program beyond what was

23   necessary.  For example, in an August 28, 2012 email by Dr. Ellis to Dr. Luby—retitled by Dr.

24   Ellis as "Your communique on fall semester issues" from Dr. Luby's original subject line, "fall

25   semester update"—Dr. Ellis accuses Dr. Luby of being "unethical," "petty," "small-minded," and

26   covertly administering the program as its Director:  "I suspect that all decision on the program are

27   being made unilaterally and secretively."  Kauffman Dec., Ex. A (AGO-1024).  Dr. Ellis further

28   states:

10

1
2

> I should inform you and Dean Sherwin that I am legally disabled and registered with the university as such.  Any verbal or written reference to my health, with respect to personnel/workplace decisions, is contrary to the provisions of ADA and is actionable.

3    Kauffman Dec., Ex. A (AGO-1025).

4         As shown in the underlying email from Dr. Luby, dated August 27, 2012, he made no

5    reference to Dr. Ellis's health, let alone one "with respect to personnel/workplace decisions"—Dr.

6    Ellis's suggested threat of legal action regarding her disability was completely disconnected from

7    their dialogue.  Kauffman Declaration, Ex. A (AGO-1025, AGO-1026).  Moreover, contrary to

8    Dr. Ellis's tone, the email from Dr. Luby is professional, civil, to the point, and even caring, as he

9    ends his email by stating:  "Finally, I know from your automatic reply email signatures over the

10   summer that you are caring for a very ill parent.  I was very sorry to read this.  Please let me

11   know if the Program can support you at this time."  Kauffman Declaration, Ex. A (AGO-1026).

12   The email is limited to providing clear and constructive expectations for the coming school year

13   following Dr. Ellis's return from sabbatical.

14        In another email, dated September 25, 2013, Dr. Ellis again accuses Dr. Luby of conspiring

15   secretly against her, this time by "lies and innuendo":  "By the way, I do keep records because the

16   level of secrecy and lack of consultation with fellow instructors, which you have initiated, is the

17   epitome of hubris.  I shudder to think of the lies and innuendo you have written in the Program

18   Review—not that I will ever see it."  Kauffman Declaration, Ex. A (AGO-1022, AGO-1023).

19   That email begins by accusing Dr. Luby of "manipulating reality" after Dr. Luby had objected to

20   statements she had made in requesting a copy of the Museum Studies courses being offered.

21   Kauffman Dec., Ex. A (AGO-1022, AGO-1023).

22        In a March 14, 2014 email, Dr. Luby reports to Deans Sherwin and Shimanoff that he has

23   been forced to initiate additional workarounds due to Dr. Ellis's failure to participate in reviewing

24   applications for admissions into the program. Kauffman Declaration, Ex. A (AGO-1027).  In that

25   email, he notes that Dr. Ellis failed to participate the previous year as well, despite advance notice

26   and request for such participation in both cases. Kauffman Dec., Ex. A (AGO-1027).  He

27   indicates that he will simply ask faculty members from the Art Department to participate as a

28   workaround the next year, instead of doing it alone.  Kauffman Declaration, Ex. A (AGO-1027).

1   Beyond explosive behavior by Dr. Ellis in her interactions with Dr. Luby, the emails show

2   that Dr. Ellis also engaged in similar behavior with the program's staff member, Christine

3   Fogarty.  According to an April 18, 2014 email provided by Dr. Luby to Mr. Kauffman, Dr. Ellis

4   is described to have had "a very bad interaction" with Ms. Fogarty, leaving Ms. Fogarty

5   "sobbing" to Dr. Luby on the phone.  Dr. Luby notes that his concern is "not so much over the

6   specific incident, but the fact that there is no relief from the pattern" of such behavior by Dr.

7   Ellis.[2]  Kauffman Dec., Ex. A (AGO-1038).

8   **IV.   OTHER INFORMATION POTENTIALLY PROVIDED TO MR. KAUFFMAN.**

9   The material discussed above is taken from documents given to Mr. Kauffman for purposes

10  of determining how to address problems with Dr. Ellis's workplace conduct at the May 19

11  meeting or, in the case of his iPad notes, are contemporaneous notations of what was said during

12  the meeting.  Even combined, however, this documentation does not provide a complete account

13  of what was discussed during the May 19 meeting.  Some of the iPad notes are general and

14  reference other problematic behavior that is not explicitly described in the notations but may have

15  been explained orally.  Unfortunately, none of the meeting attendees could recall fully what was

16  said at the meeting regarding Dr. Ellis's bizarre conduct.

17  For example, Mr. Kauffman noted what appears to be statements by Dr. Luby:  "She is a

18  bully.  She is rude and inappropriate.  I have some e-mails which demonstrate … Student

19  assistant heard this as well."  It is unclear what emails Dr. Luby is referring to in that statement,

20  as there are other emails beyond those provided to Mr. Kauffman that reference problematic

21  behavior.  In an April 18, 2014 email from the student assistant referenced above, the student

22  assistant recounts her experience in viewing Dr. Ellis "aggressively confront" Ms. Fogarty and

23  noted that she has "witnessed this once before."  The confrontation between Ms. Fogarty and Dr.

24  Ellis in question is discussed above, but the student's reference to an additional combative

25  encounter indicates that, at the very least, the student reported to Dr. Luby that she had witnessed

26  similar behavior by Dr. Ellis toward Ms. Fogarty in the past.  Gowe Dec., Ex. J (AGO-0606;

27  ───────────────
    [2] In her deposition, Dr. Ellis did not deny the substance of these interactions with Ms.
28  Fogarty.  Gowe Dec., Ex. F, pp. 215:22-25; 216; 217; 218; 219:1-14.

12

1    AGO-0611 to AGO-0613).  Whether Dr. Luby was relying on this email from the student

2    assistant when he described Dr. Ellis as a "bully" is unclear, but certainly possible, as he received

3    it only a month earlier.

4          Similarly, Dr. Luby had received additional emails from four other students concerned

5    about the lack of timely response or feedback by Dr. Ellis, other than those students referenced

6    above.  Although it does not appear that he provided these emails to Mr. Kauffman, the students

7    are referenced generally in both the emails that he did provide, as well as in the recorded notes by

8    Mr. Kauffman.  *See* Gowe Dec., Ex. K (AGO-0623 to 0624; AGO-0639 to 0640; AGO-0644;

9    AGO-0646).

10         As mentioned above, none of the individuals present at the May 19 who were deposed by

11   Dr. Ellis—Mr. Kauffman, Dr. Luby, Dean Shimanoff—could recall specifically all that was said

12   about Dr. Ellis at the meeting or by whom.  Gowe Dec., Ex. A, pp. 33-34; Ex. B, pp. 30-31; Ex. C,

13   pp. 98-99.  Nor could Ms. Fogarty, when deposed, recall every negative encounter with Dr. Ellis

14   that she had experienced, though she indicated that there were multiple.  For example, she noted

15   that there was an incident that she estimated had occurred "sometime around spring of 2013"—

16   though she was not entirely sure of the year—close to graduation, that Dr. Ellis was "upset for

17   whatever reason, just felt weird . . . she felt ballistic,  just her manner . . . ."  Gowe Dec., Ex. L, pp.

18   46:22-25 to 47:1-25.  Ms. Fogarty recalled that Dr. Luby was in the room at the time.  Gowe Dec.,

19   Ex. L, p. 48:1-5.

20         Ms. Fogarty also recalled one point, likely also in spring 2013 near graduation, where "all

21   of the students are stressed and not hearing back from Professor Ellis, etc., that it seemed like I

22   was getting too many complaints about that issue.  So I felt that it was just to much for me to

23   handle, so I went to talk to Dean Sherwin about I have all these students coming in, I just don't

24   know how to handle it, I don't know what to say, what can I do."  Gowe Dec., Ex. L, p. 54:5-23.

25   Given that Dean Sherwin was at the May 19 meeting, he may have referenced this interaction to

26   describe to Mr. Kauffman the recent deluge of student complaints against Dr. Ellis.

27         Similarly, Dean Shimanoff testified at her deposition that she recalled Dr. Luby calling her

28   "in a state of panic for the students who needed to graduate, and he said I can't get them

                                              13

1   graduated . . . He asked me if I could intervene on their behalf, and I called the dean of graduate

2   studies [Ann Hallum] . . . She said she could assist us, but this couldn't keep happening."  Gowe

3   Dec., Ex. B, p. 29:3-14.  This suggested to Dean Shimanoff that it had happened previously and

4   she made that point to those assembled for the May 19 meeting.  Gowe Dec., Ex. B, p. 35:14-23.

5        Additionally, there is no evidence that Dr. Luby, or any of the other May 19 attendees with

6   personal experience with Dr. Ellis, represented to Mr. Kauffman that the emails provided to him

7   reflected the only problematic behavior by Dr. Ellis experienced by Dr. Luby, Ms. Fogarty,

8   Museum Studies students, etc.  Nor is there any evidence that Mr. Kauffman was told by Dr.

9   Luby or anyone else that the emails provided during the meeting were the universe of documents

10  supporting or reflecting the concerns raised about Dr. Ellis at the meeting.  For example, there

11  were no emails provided to Mr. Kauffman reflecting any discussions around Dr. Ellis's brain

12  tumor in 2010, but that condition was discussed during the May 19 meeting as part of the basis

13  for concern that "there may actually be a health issue that is causing the display of inappropriate

14  behavior."  *See* Gowe Dec., Ex. A, p. 25:21-22; p. 26:1-17; *see also* Gowe Dec., Ex. B, pp. 33:19-

15  25 to 34:1-19 ("There were concerns that something may be interfering with her ability to do her

16  job which is why there was a recommendation for a fitness for duty").  As such, the above

17  account of what was discussed at the May 19 meeting that prompted the decision to require the

18  fitness-for-duty examination is a detailed but not necessarily full account of the exchanges at the

19  meeting that led those assembled to agree that a fitness-for-duty examination was appropriate.

20  Nonetheless, what facts are known fully support summary judgment as to the legality of the

21  fitness-for-duty examination required of Dr. Ellis, as the facts demonstrate that the examination

22  would have been job-related and consistent with business necessity.

### ARGUMENT

23

24  **I.   FITNESS-FOR-DUTY EXAMINATIONS ARE LEGAL OPTIONS FOR EMPLOYERS TO
        TAKE TO EXAMINE EMPLOYEES WHO MAY BE UNABLE TO PERFORM THEIR JOB
25      DUE TO A MEDICAL CONDITION.**

26       Employer-mandated fitness-for-duty examinations are lawful.  *See Yin v. State of Cal.,* 95

27  F.3d 864, 868 (9th Cir. 1996) (state could require employee to undergo independent medical

28  examination, even if goal was to determine if employee was individual with a disability or nature

14

or severity of disability, where proposed medical examination was job-related).  The directive  to

undertake a fitness-for-duty examination is not—itself—an "adverse employment action."  *See*

*Sullivan v. River Valley School Dist.,* 197 F.3d 804, 814 (6th Cir. 1999) (holding that plaintiff's

refusal to submit to a mental and physical fitness-for-duty examination was not protected activity;

the employer was entitled to order the fitness-for-duty examination, so that ordering the exam

"was not itself an adverse employment action, and suspending him for refusing to comply was not

retaliatory.").  To the contrary, such examinations are important tools used by employers to

determine whether a problematic employee is capable of performing the job, notwithstanding any

mental or physical health condition.  *See Cody v. CIGNA Healthcare of St. Louis, Inc.,* 139 F.3d

595, 599 (8th Cir. 1998) ("Employers need to be able to use reasonable means to ascertain the

cause of troubling behavior without exposing themselves to ADA claims.").  A fitness-for-duty

examination enables employers to determine how best to address an employee's work

performance issues without resorting to disciplinary action, if information known to the employer

indicates that a medical reason may be the cause of performance issues.   Thus, state law

authorizes the University to require its employees to undertake fitness-for-duty examinations.  *See*

Cal. Code Reg., title 5, div. 5, § 43404.

Used as an investigative tool, nothing about a fitness-for-duty examination runs afoul of the

ADA or the FEHA.  Those statutes prohibit an employer from taking action against an employee

based on stereotypes about that employee's disability "to prevent the unwanted exposure of the

employee's disability and the stigma it may carry."  *Sullivan*, 197 F.3d at 812; *see also* H.R. Rep.

No. 101-485 (II) at 75 and H.R. Rep. No. 101-485 (III) at 44 (1990) regarding 42 U.S.C. §

12112.[3]  This rationale, however, does not apply to this situation, where the employee has shown

---

[3] The ADA does not define "job-related" or "business necessity," but the underlying legislative history indicates that the core concern to be addressed by the fitness-for-duty provision was to avoid using an examination to discover otherwise undisclosed health conditions, as opposed to determine whether any impairments could be a factor in problematic workplace behavior.  Used this way, the exam is an investigative tool to the benefit of both the employer and employee, not an adverse action.  The House Reports speaking to this provision in the ADA are limited to discussing the concern of disability disclosures and resulting stigma, as opposed to any concerns raised by Dr. Ellis in her complaint or motion for partial summary judgment:  "An inquiry or medical examination that is not job-related serves no legitimate employer purpose, but simply serves to stigmatize the person with a disability. For example, if an employee starts to lose
(continued…)

1   belligerent behavior and dereliction of job responsibilities, and disclosed medical conditions that

2   created the possibility that her work behavior was due to a medical condition.  In fact, it was

3   preferable for the University in this case to require a fitness-for-duty examination, given Dr.

4   Ellis's erratic behavior and disclosure of her medical issues, because such an examination would

5   determine whether Dr. Ellis could perform her job duties or needed reasonable accommodation,

6   without the University being compelled to resort to disciplinary action against Dr. Ellis.  *See*

7   *EEOC v. Prevo's Family Market, Inc.,* 135 F.3d 1089, 1095 (6th Cir. 1998) ("[T]he employer

8   need not take the employee's word for it that the employee has an illness that may require special

9   accommodation. Instead, the employer has the ability to confirm or disprove the employee's

10  statement. If this were not the case, every employee could claim a disability warranting a special

11  accommodation yet deny the employer the opportunity to confirm whether a need for the

12  accommodation exists.").

13      In any event, the antidiscrimination statutes require that the examination in question be both

14  "job-related" and "consistent with business necessity."  The statutes do not require that the

15  employer be correct in hindsight in assessing the need for a fitness-for-duty examination.  "[J]ob-

16  relatedness is used in analyzing the questions or subject matter contained in a test or criteria used

17  by an employer … while business necessity, in context, is larger in scope and analyzes whether

18  there is a business reason that makes necessary the use by an employer of a test or criteria."

19  *Owusu-Ansah v. Coca-Cola Co.,* 715 F.3d 1306, 1311 (11th Cir. 2013).  Thus, "job-relatedness"

20  speaks to the scope of the particular examination and whether it is limited to evaluating the

21  employee's ability to do the job.  *See Tice v. Centre Area Trans. Auth.,* 247 F.3d 506, 515 (3d Cir.

22  2001) ("an examination that is 'job-related' and 'consistent with business necessity' must, at

23  _____

(…continued)

24  a significant amount of hair, the employer should not be able to require the person to be tested for
    cancer unless such testing is job-related. Testimony before the Committee indicated there still
25  exists widespread irrational prejudice against persons with cancer. While the employer might
    argue that it does not intend to penalize the individual, the individual with cancer may object
26  merely to being identified, independent of the consequences. As was made abundantly clear
    before the Committee, being identified as disabled often carries both blatant and subtle stigma.
27  An employer's legitimate needs will be met by allowing those medical inquiries and examinations
    which are job-related and consistent with business necessity."

28

minimum, be limited to an evaluation of the employee's condition only to the extent necessary under the circumstances to establish the employee's fitness for the work at issue").  "Business necessity" speaks to the employer's basis for requiring the examination and whether the employer has reason to believe that the employee is unable to perform her job duties.  *See Sullivan,* 197 F.3d at 812 (a mental fitness-for-duty examination is justified based on aberrant behavior that affects an employee's job performance).

An employer does not need to have absolute certainty that the employee suffers from a particular mental health condition giving rise to the aberrant behavior before requiring the examination.  To the contrary, mere doubt about the employee's ability to do her job is enough. *See Tice,* 247 F.3d at 515.  Accordingly, the business necessity standard may be met even before an employee's work performance declines if the employer is faced with sufficient evidence that could cause a reasonable person to doubt whether an employee is still capable of performing her job.  *See Brownfield v. City of Yakima,* 612 F.3d 1140, 1146 (9th Cir. 2010).

## II.   BECAUSE DR. ELLIS'S EXAMINATION WAS BOTH JOB-RELATED AND CONSISTENT WITH BUSINESS NECESSITY, THE COURT SHOULD GRANT SUMMARY JUDGMENT IN FAVOR OF THE UNIVERSITY AS TO HER FIRST AND FIFTH CAUSES OF ACTION.

### A.   The Examination Was Job-related.

Dr. Ellis never attended the fitness-for-duty examination that the University scheduled for her and, therefore, she does not have any basis, other than speculation, to establish that the examination would not have been job-related.  *Sullivan v. River Valley School Dist.,* 197 F.3d 804, 812 (6th Cir. 1999) ("Since Sullivan never submitted to the examinations, he precluded himself from being able to establish a genuine issue of material fact as to whether the exams were related to his job, or were too broad in scope.").  Dr. Ellis can point to no interview questions or other examination tools that would have been used for her examination with Dr. Henderson as testing beyond the scope of her fitness to work as a professor.  As such, she can only speculate as to whether the examination would have been job-related, and speculation is not sufficient to create a triable issue of fact.

But even the facts available to the parties show that the examination would have been job-related.  A fitness-for-duty examination is "job-related" if it is designed to test only whether the

17

employee is mentally fit to do her job.  *See id.* at 811-812 (under the ADA, "any examination ordered by the employer must be restricted to discovering whether the employee can continue to fulfill the essential functions of the job").  The evidence shows that the fitness-for-duty examination would have been designed to test only whether Dr. Ellis could perform her job duties.

Here, it is undisputed that Mr. Kauffman scheduled a mental fitness-for-duty examination for Dr. Ellis with Dr. Henderson—a psychologist who had previously examined other  University employees for the same purpose.  Dr. Henderson is a licensed psychologist who is qualified as a neuropsychologist; he is also certified as a qualified medical examiner for worker's compensation issues, as well as for pre-employment psychological evaluations for law enforcement.  He has performed such evaluations for law enforcement "for decades" and fitness-for-duty examinations outside of law enforcement contexts for "twenty years."  Gowe Dec., Ex. D, pp. 6:15-24; 7:7-11, 14-20; 9:18-21.

In his deposition, Dr. Henderson estimated having conducted fitness-for-duty examinations for eighteen different University employees, two of whom were faculty professors, over the last five years.  Gowe Dec., Ex. D, pp. 28:13-25; 29:1-14; 31:1-8.  Mr. Kauffman testified that his office made clear to Dr. Henderson what the job functions of faculty are:

> Dr. Henderson had handled other examinations of faculty in the past.  We had explained previously to Dr. Henderson what the essential functions of a faculty person generally are, which is basically instruction, classes, service to the department, advising students, research, those sorts of duties.  We had an understanding of what a faculty person's role generally is and what the essential functions of that job generally are.

Gowe Dec., Ex. A, p. 41:15-23; *see also* Kauffman Dec., ¶ 8; Henderson Dec., ¶¶ 4-5.

Mr. Kauffman also testified that he expected from Dr. Henderson only a report identifying whether the faculty member was able to perform her job:  "We then communicate to Dr. Henderson what the nature of the issue is from our perspective, and we rely on Dr. Henderson's professional judgment as a mental health professional to ascertain whether or not there may be issues that would preclude a faculty person from being able to perform the essential functions of a faculty person's position."   Gowe, Dec. Ex. A, pp. 41:24-25; 42:1-5; Kauffman Dec. ¶ 7.

1    Dr. Henderson further explained that his practice is to wait until the day of the actual

2    examination before reviewing any documentation that the University provided him about the

3    underlying basis for requesting the examination.   Gowe Dec., Ex. D, p. 35:19-24.  He testified

4    that he did not review the documentation sent to him by the University because Dr. Ellis never

5    showed up for the examination.  Gowe Dec., Ex. D, p. 19:11-25.  Dr. Henderson further testified

6    that he could not know how he would have structured the examination for Dr. Ellis because he

7    never found out what the clinical issues were in her case.  Gowe Dec., Ex. D, pp. 35:25; 36:1-2.

8    He explained that:

9         What I typically do with any individual is I have them write out some information
          about themselves, and while they are doing that, typically biographical information,
10        where they live, what their phone number is, are they married, they have children,
          what is their living situation, what is their medical situation.
11
          While they are doing that, then that's when I review the records [sent by the
12        University].  Then I have an idea as to how to structure the evaluation, was there a
          test called for, what sort of line of questioning I am concerned about.
13

14   Gowe Dec., Ex. D, p. 36:2-11.

15        Because Dr. Henderson never met with Dr. Ellis, he could not, and did not, structure an

16   examination for her.  It is therefore impossible for Dr. Ellis to establish that the examination in

17   question would have not been "job-related" for purposes of the ADA and the FEHA.  Moreover,

18   the facts that do exist indicate that both the University, through Mr. Kauffman, and Dr.

19   Henderson expected that the examination would be limited to determining whether Dr. Ellis was

20   mentally fit for her position and nothing more.  *See* Henderson Dec., ¶ 2.   As such, there is no

21   evidence that the examination would have been anything other than job-related.

22        **B.    The Examination Was Consistent with Business Necessity.**

23        The University's decision to require Dr. Ellis to undertake a fitness-for-duty examination

24   was consistent with business necessity.  The fitness-for-duty examination is an investigative tool;

25   the University used the fitness-for-duty process to determine whether workplace accommodation,

26   as opposed to discipline or informal counseling, was the appropriate approach in dealing with the

27   problematic behavior attributed to Dr. Ellis.  In particular, the University decision-maker, Mr.

28   Kauffman, decided that the fitness-for-duty examination was necessary because Dr. Ellis had

19

1   engaged in behavior that undermined her effectiveness as a professor, and did so at a time when

2   she was potentially under the influence of mental health conditions that she had—until then—

3   refused to seek accommodation for.  A fitness-for-duty examination in this context was the only

4   effective and fair means for the University to determine whether  Dr. Ellis's work behavior was

5   due to a medical condition and, thus, determine the need for reasonable accommodation, without

6   having to resort to taking disciplinary action against Dr. Ellis.

7         In making the decision for a fitness-for-duty examination, Mr. Kauffman was presented

8   with sufficient facts to indicate that an examination was the most appropriate next step.  It was

9   clear that students, two years in a row, had collectively complained that Dr. Ellis failed to timely

10  provide feedback to them or in a manner that was substantively helpful.  These complaints

11  occurred  despite Dr. Luby's efforts to work around Dr. Ellis's shortcomings, by counseling

12  students on how to obtain a response from Dr. Ellis, by reducing the number of theses she was

13  designated to read as either chair or a reader, and, at the eleventh-hour, being permitted by the

14  Dean of Graduate Studies to sign off on theses instead of Dr. Ellis so that deserving students

15  could graduate on time.  Dr. Ellis engaged in no discussion with the University to attempt to

16  improve the situation or otherwise explain her inability to fulfill her duties as a professor; she

17  may have been unable to recognize that her work issues were due to a possible medical reason.

18  From her deposition, it is apparent that she did not regard her shortcomings with the student

19  theses to be significant, despite the role of the graduate thesis as the primary work product in the

20  process.  She seemed unconcerned about the impact on students who would have been unable to

21  graduate on time and claimed to be completely unaware of their complaints.  Gowe Dec., Ex. F,

22  pp. 28:9-25; 29:1-9.  In concluding that Dr. Ellis had failed to perform her job duties, Mr.

23  Kauffman could rely, not only on Dr. Luby's recollection of events, but also on copies of the

24  students' emails to him that demonstrated the circumstances objectively.

25        The emails provided to Mr. Kauffman also showed that, despite having led the program for

26  decades and being fully aware of the admissions process to the program, Dr. Ellis was

27  inexplicably absent from the process in 2013 and 2014, and never seemed to have followed up

28  with her colleagues in the program about her lack of involvement in reviewing applications for

20

1    admission.   Likewise, as Mr. Kauffman's notes indicate, Dr. Ellis was absent from, or late to, her

2    classes, requiring Ms. Fogarty to substitute.  Dr. Luby was also forced to change "classes to

3    address her teaching deficiencies"—deficiencies borne out by her poor student evaluations for

4    2013 and 2014.  *See* Kauffman Dec. Ex. A.

5          Coupled with these examples of poor performance in recent years was Dr. Ellis's bizarrely

6    combative behavior toward colleagues and unpredictable outbursts that were suggestive of mental

7    instability.  Most revealing was her apparent pattern of accusatory and "ballistic" aggression

8    toward Dr. Luby that alternated, within moments, with tearful apologies and explanations.  Mr.

9    Kauffman was presented with a detailed account of one such interaction in January 2014, which

10   was described in Dr. Luby's contemporaneous email to Deans Sherwin and Shimanoff.  In that

11   interaction, Dr. Ellis clearly displayed mental instability in a manner that was disruptive to her

12   colleagues and left the program director unsure of her fitness to continue, given how quickly she

13   had switched from angrily accusing him of "stabbing her in the back" to "sobbing, shaking, and

14   almost unable to stand."

15         Not long after that incident, Dr. Ellis exploded at Dr. Luby in front of a tenure-track

16   candidate by confronting him about the timing of the candidate's interview schedule and

17   interrupting Dr. Luby's explanation for this by telling him to "shut up!" repeatedly.  Dr. Ellis does

18   not deny that she told him to "shut up."  *See* Gowe Dec., Ex. F, p. 194:9-12.  Dr. Ellis's  lack

19   professionalism in arguing about scheduling  in front of a tenure-track candidate, as opposed to

20   waiting for an opportune time to discuss it with Dr. Luby privately, is one indication that Dr. Ellis

21   seemed to lack awareness or insight into her behavior.  Also, her angrily shouting down Dr. Luby

22   in front of the candidate as he calmly explained the reason for the scheduling is suggestive of a

23   complete lack of self-control, consistent with Dr. Ellis's previous explanation to Dr. Luby that

24   Asperger's Syndrome caused her to sometimes be unable to control her anger.

25         In like fashion, Dr. Ellis had reportedly exploded at Ms. Fogarty a month later, after Ms.

26   Fogarty had expressed concern to her that Dr. Ellis had failed to show up for a group tour of an

27   exhibit that Dr. Ellis herself had arranged.  Dr. Ellis's angry interaction with Ms. Fogarty left Ms.

28

21

1    Fogarty in tears.  As noted above, Dr. Ellis does not dispute the substance of Ms. Fogarty's

2    account of this incident.

3          These examples of highly inappropriate, sporadic displays of unprovoked anger at the

4    workplace within a short span of months resemble the situation in *Sullivan*, where the plaintiff—

5    also a longtime educator—engaged in a series of unprofessional outbursts towards colleagues

6    within a period of months.  The Sixth Circuit, in that case, found such incidents of emotional

7    instability to support the employer's decision to require a mental fitness-for-duty examination.

8    *See Sullivan,* 197 F.3d at 808-809, 812.  Such a pattern of atypical and consistently inappropriate

9    behavior was deemed by the court to be sufficiently "aberrant" to meet the "business necessity"

10   standard.  *Id*. at 812.[4]

11         Moreover, unlike even the plaintiff in *Sullivan*, Dr. Ellis had expressly tied her behavior to

12   a mental health condition by raising her recently diagnosed Asperger's Syndrome to Dr. Luby in

13   the January interaction as explanation for her conduct.  But even if she had not raised her medical

14   condition as the cause of her behavior explicitly, it is undisputed that she revealed her diagnosis

15   to Dr. Luby around that time and that the diagnosis was discussed at the May 19 meeting.  In any

16   event, based on Dr. Luby's January email and the other information provided to him, Mr.

17   Kauffman could reasonably conclude that Dr. Ellis's escalation of unacceptable conduct and poor

18   performance *potentially* arose from limitations posed by Asperger's Syndrome, the aftermath of

19   her brain tumor, a combination of those impairments, or some other condition that Dr. Ellis was

20

21         [4] That Mr. Kauffman understood Dr. Ellis to engage in a pattern of aberrant behavior is
     clear from the record discussed above.  In this way, Dr. Ellis's situation is the opposite of the
22   plaintiff in *Kroll v. White Lake Ambulance Service*, where the decision-maker was aware of only
     two incidents of poor performance on an otherwise clear record for the employee and, moreover,
     was directing the employee to receive counseling, as opposed to a fitness-for-duty examination,
23   due to her "immoral" behavior in engaging in an extramarital affair.  763 F.3d 619, 621-622, n. 1,
     624 (6th Cir. 2014).  Here, Dr. Ellis is described as having engaged in a pattern of misconduct
24   and poor performance repeatedly over a period of at least two years, only having the incidents
     escalate at the start of 2014.  And it cannot be reasonably disputed that the examination was
25   required by Mr. Kauffman in reaction to these incidents and the question of her being subject to
     any mental impairment.  *See also Owusu-Ansah*, 715 F.3d at 1311-1312 (fitness-for-duty
26   examination deemed consistent with business necessity where plaintiff engaged in a single
     episode of misconduct:  plaintiff –"in the course of complaining about discrimination and
27   harassment—banged his fist on the table and said in a raised voice that someone was 'going to
     pay for this'" discrimination).
28

1    either unaware of, or had yet to reveal.  Neither Mr. Kauffman nor any of the other participants in

2    the May 19 meeting are mental health experts, let alone experts that had had an opportunity to

3    fully examine Dr. Ellis in particular.  A fitness-for-duty examination by a mental health expert

4    was a viable and reasonable option for the University to take to determine whether Dr. Ellis's

5    work performance defects and emotional outbursts were due to a medical reason.

6         In such a context, where the employee has disclosed information about her mental health

7    conditions that potentially explain aberrant workplace misconduct and poor performance, and the

8    employee has refrained from requesting accommodations for such conditions, it is reasonable and

9    appropriate for the employer to require a mental fitness-for-duty examination.  An examination

10   enables the employer to determine if reasonable accommodation is warranted, and the employer

11   is not required to resort to disciplinary action in the first instance.  Here, Dr. Ellis undisputedly

12   never requested an accommodation related to Asperger's Syndrome.  To the contrary, according

13   to Dr. Luby's account, she refused to accept his offer to provide whatever administrative support

14   she needed in light of that condition.  As for the effects of the brain tumor, Dr. Ellis had requested

15   accommodations only for physical limitations resulting from it, such as partial blindness.  Her

16   experience in successfully obtaining workplace accommodations for her blindness and mobility

17   limitations through the University's procedures, however, shows that Dr. Ellis was well aware

18   and capable of requesting accommodation when *she believed* she needed them.  *See* Complaint;

19   comment re ADA.  Moreover, in her regular communications with Mr. Kauffman and other

20   school officials from the time she was temporarily suspended in May 2014 to her termination in

21   December 2014, Dr. Ellis never once claimed that a mental health condition, such as Asperger's

22   Syndrome or the brain tumor or the depression that she has apparently been treated for (*see* Gowe

23   Dec., Ex. F, p. 73), were potentially responsible for the conduct underlying the fitness-for-duty

24   examination decision.[5]  She does not allege in this lawsuit that the University failed to

25   accommodate a disability or otherwise failed to engage her in the interactive process.  Clearly, Dr.

26   _____

27   [5] Even if the conduct in question arose due to workplace stress, or because existing mental conditions were triggered or exacerbated because of such stress, "an employee's ability to handle reasonably necessary stress" is an "essential function of any position" and is an appropriate issue for a mandatory fitness-for-duty examination.  *Owusu-Ansah,* 715 F.3d at 1311-1312.

28

1   Ellis does not consider an accommodation necessary for her mental health conditions.  Dr. Ellis's

2   refusal to request a reasonable accommodation, however, does not prohibit the University from

3   directing her to undergo a fitness-for-duty examination to determine whether reasonable

4   accommodation is warranted.  *See Sullivan,* 197 F.3d at 812-813 (rejecting assertion that a

5   fitness-for-duty examination can only be ordered where the employee has requested reasonable

6   accommodation).

7           Under these circumstances, where there has been a conflux and escalation in misconduct

8   and poor performance, coupled with self-identified mental health conditions that may be the

9   source of this problematic workplace behavior, it is reasonable for the employer to obtain

10   objective guidance from a mental health professional through a mandated fitness-for-duty

11   examination.  Here, the University was faced with needing to address escalating workplace

12   misconduct by Dr. Ellis that potentially could have been positively addressed by accommodations

13   or other workplace changes, rather than by disciplinary action. [6]  Even if Dr. Ellis did not believe

14   that medical issues could explain her aberrant work behavior or that her behavior was problematic

15   at all, it was appropriate for the University to investigate whether a mental health condition was at

16   the root of the disruptive behavior so as to properly address that conduct.  Although a fitness-for-

17   duty examination only results in a finding of fitness or unfitness, such a finding—either way—is

18   important in deciding whether to proceed in some sort of interactive process, as opposed to

19   seeking disciplinary action in the first instance.  In the former situation, the employer and

20           [6] In addition to workplace accommodations and disciplinary action for non-disability
based conduct, there could have been other steps available depending on the outcome of the
21   examination.  For example, the University can "demote," instead of terminate, an employee to
another position if she is mentally unfit for the position and there is no reasonable
22   accommodation that allows her to function in the position despite her disability.  Educ. Code §
89536 ("Any permanent or probationary employee who is physically or mentally unfit for the
23   position occupied may be suspended, demoted, or dismissed.").  At the same time, where the
University obtains medical or psychiatric evaluations that show that the employee "unable to
24   perform the work of his or her present position or any other position in the state university
system" despite reasonable accommodation, the University "shall file an application for disability
25   retirement on the employee's behalf."  Educ. Code § 89536.1(a).  The employee is paid a
temporary disability allowance equivalent to her retirement allowance during the pendency of the
26   application and, although she must be reinstated with backpay if CalPERS denies the retirement
application, the decision to file for retirement is not appealable to the State Personnel Board.
27   These are examples of paths that could have been taken short of the termination that ultimately
took place here had Dr. Ellis undertaken the examination.

28

24

1    employee can use the results of a fitness-for-duty examination to initiate discussion about

2    possible accommodations and how best to avoid disruptions moving forward, especially where

3    the employee had been unwilling or unable to acknowledge that he or she has such limitations.

4         Moreover, the fitness-for-duty procedures under section 43404 provide procedural

5    safeguards for the employee. The employee has the opportunity to provide her own medical

6    information, such as independent findings from her own doctor, to the University decision-maker,

7    so as to ensure that the record is complete, and the University has the benefit of findings from the

8    employee's medical expert where there is some dispute as to the need for such an examination.

9         In this way, the fitness-for-duty examination required of Dr. Ellis was an appropriate and

10   reasonable investigative tool under the specific circumstances of this case. Dr. Ellis's First and

11   Fifth Causes of Action for "unlawful medical examination" are unfounded and unsupported. The

12   Court should therefore dismiss the causes of action as a matter of law.

## CONCLUSION

14        The University's directive to Dr. Ellis to take a fitness-for-duty examination was lawful.

15   The Court should therefore grant summary judgment as to Dr. Ellis's First and Fifth Causes of

16   Action.

17   Dated:  June 10, 2016                          Respectfully Submitted,

18                                                  KAMALA D. HARRIS
                                                    Attorney General of California
19

20

21                                                  /s/  Michael D. Gowe
                                                    MICHAEL D. GOWE
22                                                  Deputy Attorney General
                                                    *Attorneys for Defendant Board of Trustees*
23

24   OK2015900357
     Motion for MSJ.doc

25

26

27

28