Noah D. Lebowitz [SBN 194982]
DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, California 94104
Telephone: (415) 433-0333
Facsimile: (415) 449-6556
E-mail: noah@dplolaw.com

Attorneys for Plaintiff
LINDA ELLIS

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

(San Francisco Division)

| | |
|---|---|
| LINDA ELLIS,<br><br>　　Plaintiff,<br><br>v.<br><br>SAN FRANCISCO STATE UNIVERSITY, and DOES 1 through 10, inclusive,<br><br>　　Defendants. | Case No. C-15-02273 TEH<br><br>**PLAINTIFF'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT MOTION FOR PARTIAL SUMMARY JUDGMENT RE: FIRST & FIFTH CAUSE OF ACTION**<br><br>Date:　　　July 11, 2016<br>Time:　　　10:00 a.m.<br>Courtroom:　2, 17th Floor<br>Judge:　　　Hon. Thelton E. Henderson |

# TABLE OF CONTENTS

I.   INTRODUCTION & SUMMARY OF ARGUMENT ........................................................ 1

II.  LEGAL ARGUMENT .................................................................................................... 3

   A.  SFSU HAS VIOLATED THE 'SHAM AFFIDAVIT RULE' .......................................... 3

   B.  SFSU HAS NOT ESTABLISHED A TRIABLE ISSUE OF FACT AS TO ITS BURDEN TO ESTABLISH THE ELEMENTS OF "BUSINESS NECESSITY" .............................. 4

      1.  SFSU's Speculative Arguments Cannot Carry Its Burden of Proof .............................. 6

      2.  SFSU Does Not Dispute the Applicability of the Standard Articulated in *Kroll v. White Lake Ambulance Authority* .................................................................................. 9

      3.  Even If, *Arguendo*, The Luby Emails Are Considered, SFSU Still Cannot Establish A Business Necessity for a Psychological Exam ............................................................ 11

   C.  SFSU HAS NOT ESTABLISHED A TRIABLE ISSUE OF FACT AS TO THE ELEMENTS OF "JOB RELATED" .................................................................................. 12

      1.  It Is Undisputed that the University Never Communicated Any of Ellis' Actual Job Duties – Essential or Otherwise – to Dr. Henderson .................................................... 13

III. CONCLUSION .............................................................................................................. 14

# **TABLE OF AUTHORITIES**

**Cases**

*Brownfield v. City of Yakima*, 612 F.3d 1140 (9th Cir. 2010) ....................................................... 4, 11

*Conroy v. New York State Dept. of Correct. Svcs.*, 333 F.3d 88 (2d Cir. 2003)............................. 4

*Cripe v. City of San Jose*, 261 F.3d 877 (9th Cir. 2001)................................................................ 1, 5

*Kroll v. White Lake Ambulance Authority*, 763 F.3d 619 (6th Cir. 2014) ....................................... 9

*Tice v. Centre Area Transp. Auth.*, 247 F.3d 506 (3rd Cir. 2001) .................................................... 4

*Yeager v. Bowlin*, 693 F.3d 1076 (9th Cir. 2012) ........................................................................ 2, 3

**Regulations**

2 Cal. Code Regs. § 11065(b).......................................................................................................... 4

2 Cal. Code Regs. § 11065(k).......................................................................................................... 12

29 CFR § 1630.14(c) App................................................................................................................ 12

## I. INTRODUCTION & SUMMARY OF ARGUMENT

On one thing we all agree:  Defendant San Francisco State University ("SFSU" or "the University") uses psychological fitness-for-duty examinations as an "investigative tool."  *See e.g.*, *Def's Opp. P&A* at 1:28, 14:8-9.  At various points of its Opposition, the University boasts that it has required its employees to submit to psychological exams at a stunning rate of nearly one per month[1] over the 2013-2014 timeframe.  The question squarely put to this Court is whether the protections of the Americans with Disabilities Act ("ADA") – as incorporated into the Rehabilitation Act of 1973 – and the California Fair Employment and Housing Act ("FEHA") permit or prohibit the University's approach.

Laws have to have meaning.  The ADA and the FEHA each protect all employees from unwarranted intrusion into their medical status.  The laws provide identical protections by prohibiting covered employers from requiring employees to undergo medical examinations unless the employer can establish, relying on objective evidence, that it is "vital to the business" to order the exam.  *Pl.'s Mot. P&A* at § VI.A.  Even then, the laws require covered employers to take reasonable steps to ensure that such exams are "tailored to assess the employee's ability to carry out the essential functions of the job. . . ."  *Id.*

Ninth Circuit law cannot be more clear:  The law does not allow employers to send employees to medical exams as a matter of "expediency" or "convenience."  *Cripe v. City of San Jose*, 261 F.3d 877, 890 (9th Cir. 2001).  The University does not believe that it is bound by these standards.  Rather, it believes that sending employees for psychological exams is a routine part of its internal investigatory process regarding workplace performance issues, and that it may send an employee to a psychological exam upon a "mere doubt" about her ability to perform her

---

[1] Kauffman required 14 employees to undergo psychological fitness for duty examinations in a 16.5-month period, thus, nearly one per month.  (Kauffman Decl. ¶ 5.)  The denominator employer here is actually conservative.  Kauffman's declaration on this point is rather vague.  He attests that beginning "in 2013" he sent 14 employees for psychological exams before making that requirement of Ellis (*i.e.,* May 19, 2014).  In our calculation, we gave Kauffman the benefit of the doubt by giving him credit for the full 12 months of 2013.  Though it very easily could have been less than that, the imprecision of his declaration precludes us being more accurate.

- 1 -

PLAINTIFF'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT MOTION FOR PARTIAL SUMMARY JUDGMENT RE: FIRST & FIFTH CAUSE OF ACTION

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

job. *Def's Opp P&A* at 15:14.  Again, 14 employees required to undergo psychological exams in 16.5 months.  It truly shocks the conscience.

Compounding the University's practices and actions is their brazen attempt to manufacture disputed facts by reliance on two sham affidavits and rampant, irresponsible speculation.  As explained in detail below, both Brian Kauffman and Elliot Henderson, PhD, signed declarations which contradict clear deposition testimony on material matters.  Neither declarant provides any justification for these material contradictions; the University fails to even acknowledge that it has submitted declarations that directly contradict sworn deposition testimony.  Under Ninth Circuit precedent, these portions of these declarations should be stricken under the sham affidavit rule.  *Yeager v. Bowlin*, 693 F.3d 1076, 1080-82 (9th Cir. 2012).  As also detailed below, the University litters its Opposition with irrelevant and inadmissible assertions, which even they admit are the result of pure speculation.  *See e.g., Def's Opp. P&A* at 11:1 ("Other Information *Potentially* Provided to Mr. Kauffman" (emphasis added).).

In the final analysis, the University's Opposition fails to dispute the truly material facts in this case:  (1) Kauffman reached his decision by the conclusion of the May 19 meeting; (2) Kauffman took Luby at his word and never did anything to verify or investigate any of Luby's assertions about Ellis prior to reaching his decision; (3) Kauffman never met with or communicated with Ellis prior to reaching his decision; (4) Kauffman did nothing to learn or understand Ellis' essential job duties; and (5) Kauffman failed to take any steps to ensure the psychological exam was tailored to assess whether Ellis could perform the essential functions of her job.  As such, SFSU cannot carry its burden on either element of Ellis' causes of action for unlawful medical exam and her claims are established.  Judgment should be entered in her favor against SFSU on her First and Fifth Cause of Action and those claims should proceed to trial on damages only.

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA 94104

## II. LEGAL ARGUMENT

### A. SFSU HAS VIOLATED THE 'SHAM AFFIDAVIT RULE'

The Ninth Circuit employs what is known as the "sham affidavit rule" when analyzing summary judgment motions. *See generally Yeager v. Bowlin*, 693 F.3d 1076, 1080-82 (9th Cir. 2012). Under that rule, a party opposing a motion for summary judgment may not create a triable issue of fact by submitting a witness declaration that materially contradicts prior sworn deposition testimony. *Id.* at 1080 (citations omitted). The rule must be employed sparingly, so as not to violate the general prohibition against making credibility assessments on summary judgment. *Id.* (citations omitted). But, in circumstances where the witness provides no context or "reasonable explanation" for the discrepancy, the trial court should reject the declaration as a sham affidavit. *Id.* at 1080-81.

The following is a comparison of Kauffman's declaration versus deposition testimony and the same for Dr. Henderson.

| DECLARATION TESTIMONY | DEPOSITION TESTIMONY |
|---|---|
| 1. Bryan Kauffman: "On or about May 19, 2014, I received copies of emails from Dr. Ed Luby, Director of the Museum Studies Program at the University. I relied on the information in the emails, in part, to make the recommendation and decision to require that Dr. Ellis attend a mental fitness-for-duty examination. True and correct copies of those emails are attached hereto as Exhibit A." (Kauffman Decl. ¶ 2) | Q. When did you ask Dr. Luby to provide you with those e-mails?<br><br>A. During the meeting on May 19.<br><br>Q. And when did he actually provide you those e-mails?<br><br>A. I believe it was within a few days. I don't recollect exactly when it was.<br><br>Q. But in any event, it was sometime after the meeting was concluded?<br><br>A. It couldn't have been before.<br><br>(Lebowitz Decl. Exh. D [Kauffman Depo at 37:19-38:4]) |
| 2. Elliot Henderson, PhD: "I recall speaking to [Kauffman] before the first faculty fitness-for-duty examination, where | Q. So did anyone -- did you learn from any source as to what Professor Ellis' job duties were? |

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA 94104

| DECLARATION TESTIMONY | DEPOSITION TESTIMONY |
|---|---|
| we discussed the general job duties of University faculty." (Henderson Decl. ¶ 3) | A.   No. (Lebowitz Decl. Exh. G [Henderson Depo 32:16-18]). |

Both of these statements go to material issues in this case. Kauffman's statements bear directly on a key issue for this Court to determine: What did Kauffman know and when did he know it? Dr. Henderson's statement bears directly on the key issue of whether the University took any steps to ensure that the psychological examination was tailored to assess whether or not Ellis could perform the essential functions of her job.

Nowhere in any of its Opposition papers does SFSU contextualize or attempt to explain these material contradictions. In fact, nowhere in its Opposition papers does SFSU even acknowledge that a conflict exists. Thus, the University has waived its opportunity to avoid the sham affidavit rule. The Court should apply that rule and (1) strike Paragraph 2 and Exhibit A from the Kauffman Declaration, and (2) strike Paragraph 3 from the Henderson Declaration.

### B. SFSU HAS NOT ESTABLISHED A TRIABLE ISSUE OF FACT AS TO ITS BURDEN TO ESTABLISH THE ELEMENTS OF "BUSINESS NECESSITY"

A psychological examination is *not* an "investigative tool." "[A] fitness-for-duty exam . . . is not an excuse for every wide-ranging assessment of mental or physical debilitation that could conceivably affect the quality of an employee's job performance." *Brownfield v. City of Yakima*, 612 F.3d 1140, 1146 (9th Cir. 2010). An employer may only require an employee to undergo a psychological examination as a condition of continued employment *if* it can establish – through reliance on objective facts – that requiring such an examination is "vital to the business." *Conroy v. New York State Dept. of Correct. Svcs.*, 333 F.3d 88, 97-98 (2d Cir. 2003); *Brownfield*, 612 F.3d at 1146 (9th Cir. 2010) (citing *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 518 (3rd Cir. 2001)); 2 Cal. Code Regs. § 11065(b).

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA 94104

SFSU's position in this case – borne out by its actions – renders the law meaningless.  An employer cannot willy-nilly require employees to undergo psychological examinations because it is curious or has some sort of subjective inkling that an employee might be impaired by a psychological condition.[2]  The law requires employers to take reasonable steps *prior to making a decision* in order to ensure that a medical examination is justified.  The business necessity standard "is quite high, and is not to be confused with mere expediency."  *Cripe*, 261 F.3d at 890.  Contrary to the University's viewpoint, "mere doubt" is not enough in the Ninth Circuit.  *Def's Opp P&A* at 15:14.

The record reveals that Kauffman relied exclusively on subjective, mostly second-hand, reports of alleged issues with Ellis' conduct in the workplace.  Instead of engaging in any sort of diligence to ensure accuracy and objective reporting of issues, Kauffman elected the convenient and expedient path of requiring a psychological examination.  As he testified:  "I basically take the word of the individual bringing the issue to me. . ."  (Lebowitz Decl. Exh. D [Kauffman Depo 35:13-15].).  He never spoke with Fogarty.  He never spoke with any students.  Most importantly, he never spoke with Ellis.  Not only did he not speak with Ellis, he *refused* to speak with her.  *Pl.'s Mot. P&A* at § IV.D.

In its Opposition, SFSU proclaims that Ellis misunderstands the role of medical examinations in the workplace.  This assertion betrays SFSU's failures.  It is the University which fails to understand the role of the federal and state law protections against unwarranted intrusions into employees' physical and mental health.  A psychological examination is not an "investigative tool" to be wielded at any time.  The ADA and FEHA are in place to ensure that employers do their diligence; that they do not use medical examinations as a substitute for personnel management.  Kauffman, again in his own words, explaining the University's approach to diligence in cases like this:

---

[2] Kauffman's testimony on this point is telling:  "I remember having the *impression* that there *may be* a health issue that was maybe at play with the situation, my recollection mostly being based on *some of the discussion* of her cancer history or tumor issue.  I am not sure if it was cancerous or not."  (Gowe Decl. Exh. A [Kauffman Depo 26:6-10 (emphasis added).]).  This was the extent of Kauffman's knowledge of any potential medical issue of Ellis.

- 5 -

PLAINTIFF'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT MOTION FOR PARTIAL SUMMARY JUDGMENT RE: FIRST & FIFTH CAUSE OF ACTION

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

> Generally – the process that I go through when I am dealing with a fitness for duty issue *is not to investigate it to determine facts. I basically take the word of the individual bringing the issue to me,* I didn't have any reason to believe Dr. Luby was lying to me, and then basically allowing the mental health physician, provider, to make the assessment as to whether or not the person is fit or unfit to be at work
>
> If I am being provided inaccurate facts, then typically the person would be found fit and they would come back to work.

(Lebowitz Decl. Exh. D [Kauffman Depo 35:11-22 (emphasis added)].).  If it was not clear before, Kauffman repeated his approach:

> Q.   Prior to sending the letters that are reflected in Exhibit 1 [the May 20 letters], why did you not ask Professor Ellis for a meeting to ask her perspective on the issues that were being presented?
>
> A.   I believe I have already answered that.  I didn't believe it was necessary, and *it is not part of my process to try to determine facts for the basis for the concerns.  I take the word of the individual who is bringing the concerns to my attention*.  If it turns out those were factually inaccurate, it typically would come out in the fitness for duty evaluation.

(*Id.* at 54:19-55:4 (emphasis added)).  Kauffman's process, then, is to abdicate the University's legal obligations and to instead invest the mental health examiner with such obligations.  It cannot be stated more plainly:  This process violates both federal and state law.  Kauffman's own admissions establish that the University cannot carry its burden in this case.

### 1. SFSU's Speculative Arguments Cannot Carry Its Burden of Proof

If Kauffman's admissions are not enough to carry the day, then the addition of the University's reliance on pure, unadulterated speculation must tip the decision in Ellis' favor.  The University concludes the "Background" section of its brief as follows:  "Other Information *Potentially* Provided to Mr. Kauffman." *Def's Opp. P&A* at 11:1 (emphasis added).  The University opens this section with a demonstrably false statement:  "The material discussed above is taken from documents given to Mr. Kauffman for purposes of determining how to address problems with Dr. Ellis's [*sic*] workplace conduct at the May 19 meeting. . ." *Id.* at 11:2-4.  As shown above, Kauffman's sworn deposition testimony establishes that he could not have received those documents (the Luby emails) at the May 19 meeting.  *See supra* § II.A.

- 6 -

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA 94104

From there, the University spends the ensuing two and one half pages engaged in wild speculation that it knows cannot be considered by this Court in the course of deciding this motion. Littered with phrases like "may have been explained orally," the University compounds its speculation by incorporating assumptions into subsequent speculation. First, it states: "Mr. Kauffman noted what *appears to be* statements by Dr. Luby. . ." *Id.* at 11:10 (emphasis added). Then, the University uses that assumption to reach its further speculation "It is unclear what emails Dr. Luby is referring to in *that statement*. . ." *Id.* at 11:12 (emphasis added). This second statement assumes that its original speculation – i.e., that Luby was the speaker being referenced in the note – is correct, then goes on to make the completely irrelevant assertion that "there are other emails beyond those provided to Mr. Kauffman that reference problematic behavior." *Id.* at 11:13-14. This further reference to "other emails" that are hearsay and not properly authenticated (*see* Objection to Evidence Nos. 8-9) is an inflammatory attempt to color the Court's view of this case. The University rounds out its argument on this point with yet more speculation: "Whether Dr. Luby was relying on this email . . . is unclear, but *certainly possible*, as he received it only a month earlier." *Id.* at 11:20-22 (emphasis added). This statement is, again, impregnated with the prior assumption that Luby was the speaker referenced in the notes. Then further speculates that it was "certainly possible" that he was referencing the cited email. This argument cannot be made, or received, with a straight face.

The University goes on through the ensuing pages to put forth several other presumed statements and communications. Making statements like: "Although it does not appear that he provided these emails to Mr. Kauffman. . ." then going on to reference and rely on them anyway. *Id.* at 11:25. Quoting testimony about an event "likely also in the Spring 2013" from a witness who was not at the May 19 meeting, then leaping to the assertion that Dean Sherwin "may have referenced this interaction" during the May 19 meeting. *Id.* at 12:11-17. Further relying on the false statement that the Luby emails were presented to Kauffman at the May 19 meeting, then speculating – based on its absence from Kauffman's notes – that nobody informed Kauffman that those emails were the entire universe of issues with Ellis. *Id.* at 12:24-13:7.

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA 94104

SFSU also litters its Opposition with allegations of misconduct that were clearly *never* communicated to Kauffman. Its citations to Christine Fogarty's testimony is particularly suspect. Fogarty was not at the May 19 meeting. Kauffman never spoke with Fogarty about any of the issues related to Ellis. (Lebowitz Decl. Exh. D [Kauffman Depo 34:15-35:3].). As Kauffman testified, he "didn't believe it was necessary." (*Id.*)[3]

The University then doubles-down on these spurious, speculative arguments in the final sections of its brief. Intermingling a sprinkling of actual facts with other "facts" based wholly on speculation and innuendo, SFSU castes unwarranted aspersions and lobs inflammatory rhetoric at Ellis. Indeed, the University's characterization of "escalation in misconduct and poor performance" is pure hyperbole made without any reference to facts, real or imagined.[4] The University's assertion that Ellis "exploded at Dr. Luby" and told Luby "to 'shut up' repeatedly" is irresponsible and false.[5] All of this invective must be placed to one side as we employ principled legal analysis to the admissible facts. When we do so, what we see is an institution that refuses to take seriously the obligations placed upon it by the United States Congress and California Legislature. What is clear from the University's opposition papers is that the

---

[3] Moreover, when we read the University's cited deposition excerpts, we see Fogarty's testimony is not nearly as damning as SFSU makes out. Instead of stopping at page 47, line 25, the Court should continue reading the entirety of page 48 and through page 49, line 2. That testimony contextualizes the situation and shows it was diffused quickly and nothing more came of it. Indeed, the trio of Luby, Fogarty, and Ellis proceed to the graduation ceremony without incident and Luby never even inquired if Fogarty felt unsafe or fearful. (Gowe Decl. Exh. L [Fogarty Depo 48:1-49:2].).

[4] For example, the University purports to cite Ellis' "poor student evaluations for 2013 and 2014." *Def's P&A* at 21:1-2. However, the cited exhibit (Exhibit A to the Kauffman Decl.) contains only emails and not one student evaluation. Nowhere in any of Kauffman's communications to Ellis in 2014, or in his deposition, or in his declaration, does he reference "poor student evaluations" as a basis for requiring the psychological examination.

[5] Indeed, Ellis admits to saying "Oh, shut up" to Luby on a single occasion. (Gowe Decl. Exh. Exh. F [Ellis Depo 194:19]). There is *no evidence*, however, that Ellis ever said anything like that "repeatedly" to anyone, including Luby. We cannot imagine the mayhem that would ensue if a single utterance like this were sufficient objective evidence to require a psychological exam.

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA 94104

institution believes it has every right to operate this way and will continue to do so unless and until this Court tells it otherwise.

### 2. SFSU Does Not Dispute the Applicability of the Standard Articulated in *Kroll v. White Lake Ambulance Authority*

In *Kroll v. White Lake Ambulance Authority*, 763 F.3d 619 (6th Cir. 2014), the Sixth Circuit set a very straightforward and rational approach to analyzing claims for unlawful medical exam under the ADA. *See Pl's Mot. P&A* at 13:24-14:8. Under that approach, the Court is limited in its inquiry to: What did the decision-maker know and when did he know it? *Id.* In a footnote in its opposition, SFSU attempts to distinguish *Kroll*'s application to this case. *Def.'s Opp. P&A* at 22 n.4. However, that attempt is limited to the facts of *Kroll* and not to the key holding cited above. So, even if we accept SFSU's point for sake of argument, the University failed to address *Kroll*'s central legal holding, thereby leaving it unchallenged.

This point is crucial to the proper analysis of this motion. The vast majority of SFSU's Opposition reflects the University's attempt to muddy the waters and confuse the Court into believing that there is a dispute in material fact by referencing allegations that were *never* communicated to the decision-maker. In order to properly analyze this case, however, we must disentangle those material facts from the immaterial and irrelevant facts.

Kauffman testified unequivocally under oath that his decision was made and finalized by the conclusion of the May 19 meeting. (Lebowitz Decl. Exh. D [Kauffman Depo 24:16-28:7, 45:8-46:15].).

> Q. So at the conclusion of this meeting, is it fair to say the decision had been made to require Professor Ellis undergo a fitness for duty exam?
>
> A. Yes.
>
> Q. And that the fitness for duty exam in question would be a mental health fitness for duty exam?
>
> A. Yes.

(*Id.* at 28:1-7). The *only* relevant facts in this case, then, are those that Kauffman knew by the conclusion of the May 19 meeting. *Kroll*, 763 F.3d at 623, 625.

- 9 -
PLAINTIFF'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT MOTION FOR PARTIAL SUMMARY JUDGMENT RE: FIRST & FIFTH CAUSE OF ACTION

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA 94104

The importance of this analytical framework cannot be understated.  Kauffman testified under oath that he did not receive the Luby emails until *after* the conclusion of the May 19 meeting.

> Q.   When did you ask Dr. Luby to provide you with those e-mails?
>
> A.   During the meeting on May 19.
>
> Q.   And when did he actually provide you those e-mails?
>
> A.   I believe it was within a few days.  I don't recall exactly when it was.
>
> Q.   *But in any event, it was sometime after the meeting was concluded?*
>
> A.   *It couldn't have been before.*

(Lebowitz Decl. Exh. D [Kauffman Depo at 37:19-38:4 (emphasis added).].).  Desperate to cloud the record with irrelevant materials, SFSU submitted a declaration from Kauffman that contradicts this statement without any explanation or even acknowledgement that it is contradictory.  (Kauffman Decl. ¶ 2).  This direct contradiction cannot stand in the face of Kauffman's combined sworn testimony that he made the decision by the conclusion of the May 19 meeting and that there is no way he could have considered any emails from Luby in reaching that decision because he did not request any such emails until the meeting, itself.

Moreover, the rampant speculation and invective employed through the rest of the University's brief must be rejected.

### a)   SFSU Cannot Rely on Kauffman's Alleged "Notes" from the May 19 Meeting Because they are Inadmissible Hearsay

SFSU attempts to rescue Kauffman from his sworn deposition testimony by submitting a document that Kauffman asserts is his notes from the May 19 meeting.  SFSU cannot rely on this document because it is inadmissible hearsay, with no exception.  *See* Objections to Evidence No. 1. Kauffman makes no attempt to show that this document is a business record.  And, even if it were a business record, the content of the document must still pass the hearsay test.  In its Opposition, the University has offered these statements for the truth of the matters asserted – relying on them to argue that the University had a business necessity to require the psychological

examination.  However, the University has made no attempt to qualify either the document or the contents of the document for any hearsay exception. The statements in the document are unattributed.  We have no idea who is making any of the statements or the context of the statements and cannot even begin to assess the reliability of any of the contents of the document.[6]  It must be rejected.

### 3. Even If, *Arguendo*, The Luby Emails Are Considered, SFSU Still Cannot Establish A Business Necessity for a Psychological Exam

Even if we accept as true (which it is not) that Kauffman reviewed and relied on the Luby emails in reaching the decision to require Ellis to undergo a psychological examination, the emails still do not establish a business necessity.  Rather, *at most*, they give rise to the implication that Ellis' conduct was perhaps "annoying or inefficient."  In the Ninth Circuit, such conduct is not sufficient to establish a business necessity.  *Brownfield*, 612 F.3d at 1146.

When actually reviewed for content, the emails fall into two categories:

(1) Issues regarding the timeliness of Ellis providing feedback on graduate student theses;

(2) Issues related to communications between Ellis and Luby and/or Fogarty

The email exchanges reflected in pages AGO-1021 through AGO-1028 are unremarkable.  They represent a single email exchange in September 2013 and another exchange in August-September 2012.[7]  The substance of each of these exchanges can fairly be characterized as differences of opinion as to course offerings and scheduling.  Do they represent a difference of opinion between university faculty who have worked together for over a decade?  Yes.  Does Ellis occasionally employ some colorful language?  Sure.  Do the exchanges reflect an employee

---

[6] This document was not produced as part of the University's Initial Disclosures.  Nor was it produced in response to Ellis' Request for Production of Documents, even though it was responsive.  It was only when asked at deposition if he had any notes from the meeting that Kauffman revealed that he thought he had such notes "in the cloud."  The document submitted as Exhibit B to his declaration was not produced until after his deposition. (Lebowitz Suppl. Decl. ¶¶ 2-4).

[7] Almost all of the remainder of the emails are inadmissible.  Objections to Evidence Nos. 10-20.

- 11 -

PLAINTIFF'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT MOTION FOR PARTIAL SUMMARY JUDGMENT RE: FIRST & FIFTH CAUSE OF ACTION

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA 94104

who is demonstrating signs of mental illness or some sort of mental incapacity?  Not in the least.  If this type of exchange were sufficient to establish a business necessity for a psychological examination, there would be hardly a university faculty member in this country not subject to such an exam.  At most, these exchanges represent a common, every-day exchange among coworkers.[8]  It is certainly not *objective evidence* upon which an employer can justify a psychological examination.  Rather, if anything, these exchanges should have given rise to coaching and performance management in a personnel/human resources context.  Doing so would have been in line with University resources and procedures.  (Lebowitz Decl. Exh. D [Kauffman Depo 21:16-23:11].).

### C. SFSU HAS NOT ESTABLISHED A TRIABLE ISSUE OF FACT AS TO THE ELEMENTS OF "JOB RELATED"

The law requires an employer to take affirmative steps to ensure that a required psychological examination is "job related." In other words, the employer must ensure that the examination is "tailored to assess the employee's ability to carry out the essential functions of the job or to determine whether the employee poses a danger to the employee or others due to disability."  2 Cal. Code Regs. § 11065(k); *see also* 29 CFR § 1630.14(c) App.  Throughout its Opposition, SFSU demonstrates its failures in regard to this requirement.  In particular, the University is of the belief that it only need communicate the "general job duties" of an employee to the medical examiner.  Even more, the University is of the belief that it need not communicate any of the employee's actual job duties to the examiner.  In keeping with its belief that it can abrogate its legal responsibilities in regard to investigating underlying facts, the University believes it can abrogate its responsibilities in tailoring the examination to the examiner.  By placing the burden on employers to establish this element, the law requires employers do more.

---

[8] As Kauffman testified, Luby told him there some "interactions through e-mail to faculty and staff being of a nature that weren't very collegial."  (Gowe Decl. Exh. A [Kauffman Depo 34:11-13].).

- 12 -

PLAINTIFF'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT MOTION FOR PARTIAL SUMMARY JUDGMENT RE: FIRST & FIFTH CAUSE OF ACTION

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA 94104

### 1. It Is Undisputed that the University Never Communicated Any of Ellis' Actual Job Duties – Essential or Otherwise – to Dr. Henderson

As detailed in the moving papers, Kauffman never took any steps to learn any facts about Ellis' job or her job duties. *Pl.'s Mot. P&A* at § IV.E. In those same papers, Ellis described all of her various responsibilities and duties in the Spring 2014 semester. (Ellis Decl. ¶¶ 3-9). In its Opposition, the University fails to dispute (or acknowledge in any way for that matter) Ellis' description of her responsibilities. Thus, they remain undisputed.

What they do submit in their Opposition are statements that are either directly contradicted by sworn deposition testimony, or reflect communications so vague and remote that they cannot meet the University's burden to establish job relatedness. As noted above, Dr. Henderson's declaration is materially false and directly contradicts his deposition testimony. *See supra* § II.A. Kauffman purports to vaguely remember a conversation in which he described the "general" job duties of a SFSU faculty member to Dr. Henderson. This statement cannot carry the University's burden for several reasons. First, it is entirely unspecific as to time or context. We have no idea when this conversation took place in relation to May 19, 2014 except that it took place sometime in 2013. (Kauffman Decl. ¶ 8). We have no idea in which department the original faculty member worked. We thus have no idea whether the description has any actual relation to the essential functions of Ellis' job in the Spring of 2014. Secondly, the statement is hopelessly vague as to content. Kauffman cannot recall any details of the conversation.

What we do know from Kauffman's description – and the University's subsequent argument – is that the only substance communicated to Dr. Henderson was the "general job duties" purportedly applicable to all SFSU faculty members.

> I recall speaking to Dr. Henderson before the first faculty fitness-for-duty examination in 2013, where we discussed the *general job duties* of University faculty. My purpose in discussing the *general job duties* of faculty members at the University was to ensure that Dr. Henderson had the necessary information to conduct the examinations in terms of determining whether the employee was mentally fit *to perform those job duties*.

(*Id.* (emphasis added).). This statement, alone, eliminates the University's ability to establish that the examination was job related and Ellis' claims are established.

- 13 -
PLAINTIFF'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT MOTION FOR PARTIAL SUMMARY JUDGMENT RE: FIRST & FIFTH CAUSE OF ACTION

Dr. Henderson's declaration on this point similarly shows the University's failure.  Dr. Henderson recalls a conversation with Kaufmann in which they "discussed the *general* job duties of University faculty" for the purpose of ensuring that Dr. Henderson "had the necessary information to conduct the examination in terms of determining whether the employee was mentally fit to perform *those job duties*."  (Henderson Decl. ¶ 3 (emphasis added).).  Again, nothing about essential functions.  Again, no identification of which faculty member or in which department the particular faculty member worked.  Again, imprecision as to the timing of this conversation.  In any event, both Kaufmann's and Dr. Henderson's declarations make one thing crystal clear:  The University did *not* communicate with Dr. Henderson at any time about Ellis and the *essential* functions of *her* job.  (*See also* Gowe Decl. Exh. A [Kauffman Depo 42:6-14].).  Thus, the University cannot meet an essential element of its burden and Ellis' claims are established.

Therefore, even if *arguendo* the Court rules that the University has raised a triable issue as to business necessity, judgment must still be entered in Ellis' favor because the University cannot meet its burden to show the exam was job related.

## III.  CONCLUSION

The University bears the burden of proof as to Ellis' claims for unlawful medical exam.  Based on all the admissible evidence presented to this Court, the University cannot meet that burden.  Ellis respectfully requests judgment be entered in her favor on her First Cause of Action to the extent it sets forth a claim for unlawful medical examination under the Rehabilitation Act and her Fifth Cause of Action for unlawful medical examination under the FEHA.

Dated:  June 17, 2016                DUCKWORTH PETERS LEBOWITZ OLIVIER LLP


By:___/s/ Noah D. Lebowitz_____,
         Noah D. Lebowitz
     Attorneys for Plaintiff Linda Ellis