1  Noah D. Lebowitz [SBN 194982]
DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
2  100 Bush Street, Suite 1800
San Francisco, California 94104
3  Telephone: (415) 433-0333
Facsimile: (415) 449-6556
4  E-mail: noah@dplolaw.com

5  Attorneys for Plaintiff
LINDA ELLIS
6

7

8

9                  **UNITED STATES DISTRICT COURT**

10                **NORTHERN DISTRICT OF CALIFORNIA**

11                       (San Francisco Division)

12

13  LINDA ELLIS,                          Case No. C-15-02273 TEH

14       Plaintiff,

15                                        **PLAINTIFF'S MEMORANDUM OF**
                                          **POINTS AND AUTHORITIES IN**
16  v.                                    **OPPOSITION TO DEFENDANT'S**
                                          **MOTION FOR PARTIAL SUMMARY**
17                                        **JUDGMENT**
    SAN FRANCISCO STATE UNIVERSITY,
18  and DOES 1 through 10, inclusive,     Date:        July 25, 2016
                                          Time:        10:00 a.m.
19       Defendants.                      Courtroom:   2, 17th Floor
                                          Judge:       Hon. Thelton E. Henderson
20

21

22

23

24

25

26

27

28

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA 94104

PLAINTIFF'S MEM. P & A IN OPP. TO DEF'S MOT. FOR PARTIAL SUMMARY JUDGMENT

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA 94104

# TABLE OF CONTENTS

I.     STATEMENT OF ISSUES TO BE DECIDED ............................................... 1

II.    INTRODUCTION ............................................................................... 1

III.   BACKGROUND ................................................................................ 2

    A.   THE MUSEUM STUDIES PROGRAM ............................................ 2

    B.   THE MAY 19 MEETING AND FITNESS FOR DUTY EXAM ..................... 3

    C.   KAUFFMAN DID NOTHING TO VERIFY LUBY'S COMPLAINTS OR
       INVESTIGATE ANY OF THE UNDERLYING FACTS BEFORE REQUIRING ELLIS
       TO UNDERGO THE FITNESS FOR DUTY EXAM ....................................... 4

    D.   KAUFFMAN REFUSED TO CONSIDER ELLIS' REBUTTALS AND REFUSED TO
       MEET WITH HER ................................................................................ 5

    E.   KAUFFMAN DID NOTHING TO ENSURE THAT THE FITNESS FOR DUTY EXAM
       WAS LIMITED IN SCOPE TO ASSESSING WHETHER ELLIS WAS CAPABLE OF
       PERFORMING THE ESSENTIAL FUNCTIONS OF HER JOB ....................... 6

    F.   SFSU DISCIPLINED, THEN TERMINATED ELLIS BECAUSE SHE REFUSED TO
       ATTEND THE FITNESS FOR DUTY EXAM ............................................. 7

IV.    LEGAL ARGUMENT ........................................................................ 8

    A.   THE LEGAL STANDARDS AT ISSUE: THE REHABILITATION ACT & FEHA ...... 8

    B.   SFSU CANNOT MEET ITS BURDEN TO PROVE THAT REQUIRING ELLIS TO
       UNDERGO A PSYCHOLOGICAL EXAMINATION WAS VITAL TO THE
       BUSINESS OF THE UNIVERSITY ...................................................... 11

       1.   SFSU's Contradictory Witness Declarations Cannot Support Its Burden ................... 11

       2.   The Court's Inquiry as to "Business Necessity" Is Limited to What Bryan Kauffman
          Knew by the Conclusion of the May 19 Meeting ...................................... 12

       3.   Kauffman's Decision Was the Definition of Expediency & Convenience, not
          "Business Necessity" ...................................................... 12

          a)   Kauffman's Knowledge Was Based Entirely on What He Was Told by Luby at the
             May 19 Meeting ...................................................... 13

b)    Kauffman's Exclusive Reliance on Luby's Assertions Was Not Objectively Reasonable ................................................................................................ 14

c)    SFSU Cannot Meet Its Burden Because If Kauffman Had Done His Diligence, He Would Have Learned There Was Not Objective Evidence To Support A Business Necessity ............................................................................................ 14

d)    SFSU's Speculative Arguments Cannot Carry Its Burden of Proof ...................... 18

e)    SFSU's Failures Are Highlighted in Comparison to USF's ................................. 20

C.   SFSU CANNOT MEET ITS BURDEN TO PROVE THAT IT TOOK ACTIONS TO ENSURE THE MEDICAL EXAM WAS TAILORED TO EVALUATE ELLIS' ABILITY TO CARRY OUT THE ESSENTIAL FUNCTIONS OF HER POSITION ... 22

V.     CONCLUSION ............................................................................................ 25

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

PLAINTIFF'S MEM. P & A IN OPP. TO DEF'S MOT. FOR PARTIAL SUMMARY JUDGMENT

# **TABLE OF AUTHORITIES**

**Cases**

*Brownfield v. City of Yakima*, 612 F.3d 1140 (9th Cir. 2010) ................................... 2, 8, 12, 13, 14

*Conroy v. New York State Dept. of Correct. Svcs.*, 333 F.3d 88 (2d Cir. 2003)........................... 8

*Cripe v. City of San Jose*, 261 F.3d 877 (9th Cir. 2001)........................................... 8, 10

*Ellis v. San Francisco State Univ.*, 114 F. Supp. 3d 884 (N.D. Cal. 2015) ("*Ellis I*") ............. 2, 25

*Ellis v. San Francisco State Univ.*, 136 F. Supp. 3d 1140 (N.D. Cal. 2015) ("*Ellis II*")............... 8

*Kao v. University of San Francisco*, 229 Cal.App.4th 437 (2014) ......................................... 20, 21

*Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619 (6th Cir. 2014)........................ 2, 9,  8, 12, 13

*Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804 (6th Cir. 1999) .................................. 8

*Tice v. Centre Area Transp. Auth.*, 247 F.3d 506 (3rd Cir. 2001) ................................. 8

**Statutes**

Cal. Gov. Code § 12940(f)........................................................................ 8, 9

42 USC § 12112(d) ............................................................................. 8, 9

**Regulations**

2 Cal. Code Regs. § 11065(e)(1) .................................................................. 9

2 Cal. Code Regs. § 11065(e)(3) .................................................................. 9

2 Cal. Code Regs. § 11065(b) .................................................................... 8

2 Cal. Code Regs. § 11065(k) .................................................................... 9

2 Cal. Code Regs. § 11071(d)(1) ................................................................. 8

29 CFR § 1630.14(c) ............................................................................. 8

29 CFR § 1630.14(c) App........................................................................ 9, 25

29 CFR § 1630.2(n) ............................................................................. 9

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

## I.  STATEMENT OF ISSUES TO BE DECIDED

Plaintiff Linda Ellis ("Ellis") filed her Notice of Motion and Motion for Partial Summary Judgment Re: First and Fifth Cause of Action on May 27, 2016.  (Dkt. 44).  On the same date that Defendant San Francisco State University ("SFSU" or "the University") filed its Opposition (Dkt. 48) to that motion, SFSU filed this motion (Dkt. 47), asserting that it is entitled to summary judgment on the same claims.  Based on the undisputed facts and legal arguments made in her affirmative motion, Ellis is entitled to judgment on her claims for unlawful medical exam.  Should the Court agree, then this motion is moot and the Court need not consider it.

In order to prevail on this motion, SFSU must provide admissible evidence sufficient to carry its burden of proof at trial that the required psychological examination was both justified by a business necessity and was job related.  Both federal and state law place the burden on SFSU to establish that the required psychological examination was "vital to the business" of the University and that it took steps to ensure that the examination was "tailored to assess the employee's ability to carry out the essential functions of the job."  Because the University has not provided such admissible evidence to meet the required legal standard, it has not carried its burden and the motion should be denied.

## II.  INTRODUCTION

Both federal and state law protect employees from having to submit to unjustified and unlimited medical exams as a condition of employment.  The Americans with Disabilities Act ("ADA") articulated those protections in 1990 and the California Fair Employment and Housing Act ("FEHA") was amended to include identical protections in 2000.  These laws function to, among other things, prevent employers from using medical examinations as a substitute for personnel management.  These laws function to prevent employers from using medical examinations in the manner that SFSU boasts of using them:  As an "investigative tool" which it employs at an astonishing rate of nearly one per month.[1]

---

[1] Kauffman required 14 employees to undergo psychological fitness for duty examinations in a 16.5-month period, thus, nearly one per month.  (Declaration of Bryan Kauffman in Support of Defendant's Motion for Partial Summary Judgment ("Kauffman Decl.") ¶ 5.)  The denominator employed here is actually conservative.  Kauffman's declaration on this

- 1 -

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

In December 2014, SFSU ended Ellis' 27-year career as a professor in the University's Museum Studies Program because she exercised her civil rights and refused to undergo an unjustified, unlimited psychological exam – an examination that was being required as an expedient, convenient alternative to engaging in personnel management.  SFSU now seeks this Court's endorsement for its flaunting of federal and state laws by seeking summary judgment on Ellis' claims for unlawful medical exam.  It is the University's burden to prove both legal elements – that requiring Ellis to undergo a psychological examination was vital to the business of the University and that the exam was tailored to asses Ellis' ability to perform the essential functions of her job.  *Brownfield v. City of Yakima*, 612 F.3d 1140, 1146 (9th Cir. 2010); *Ellis v. San Francisco State Univ.*, 114 F. Supp. 3d 884, 887 (N.D. Cal. 2015) ("*Ellis I*"); *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014).  Because the University cannot meet its burden, this motion should be denied.

## III.  BACKGROUND

### A.  THE MUSEUM STUDIES PROGRAM

Ellis was employed as a professor in SFSU's Museum Studies Program from 1987 through December 2014.  (Declaration of Noah D. Lebowitz in Support of Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment ("Lebowitz Decl.") Exh. A [FAC ¶¶ 6, 63]; *id.* Exh. B [Answer ¶¶ 6, 63]; Declaration of Linda Ellis in Support of Plaintiff's Motion for Partial Summary Judgment ("Ellis Decl.") ¶ 2 & Exh. A).  The Museum Studies Program is a Master's degree program.  (Ellis Decl. ¶ 3.)  During the time period relevant to this case, the Museum Studies Program had two full-time tenured faculty members (Ellis and Edward Luby) and one staff member (Christine Fogarty).  (*Id.*).  Ellis was the Director of the program from its inception until 2011 when Luby assumed the role.  (*Id.* at ¶ 2).  Paul Sherwin, Dean of the College of Liberal & Creative Arts, was the administrator in charge of the program.  (*Id.* at ¶ 3).

point is rather vague.  He attests that beginning "in 2013" he sent 14 employees for psychological exams before making that requirement of Ellis (*i.e.*, May 19, 2014).  In our calculation, we gave Kauffman the benefit of the doubt by giving him credit for the full 12 months of 2013.  Though it very easily could have been less than that, the imprecision of his declaration precludes us being more accurate.

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

In the Spring semester 2014, Ellis had three primary job responsibilities:  (1) classroom teaching and student off-campus supervision; (2) advising thesis students; and (3) curating  the University museum.  (*Id.* at ¶¶ 4-9).  She taught two seminar classes and oversaw the internship program as well as the students who curated exhibitions at off-campus museums.  She served as primary advisor to seven students and secondary advisor to four students completing their theses.  And, she was responsible for the design and operation of the University museum.  (*Id.*)

## B.  THE MAY 19 MEETING AND FITNESS FOR DUTY EXAM

On May 20, 2014, SFSU transmitted two letters ("the May 20 letters") to Ellis informing her that the University was placing her on "paid Temporary Suspension" and ordering her to undergo a fitness-for-duty examination as a condition of continued employment.  (Lebowitz Decl. Exh. A [FAC ¶ 30]; *id.* at Exh. B [Answer ¶ 30]; *id.* at Exh. C).  The decision to impose this requirement on Ellis was made at the conclusion of a meeting that took place on May 19, 2014 ("the May 19 meeting").  (Lebowitz Decl. Exh. D [Kauffman Depo. 28:1-7, 45:8-46:15).  That meeting took place in a conference room on campus and was attended by the following people:  (1) Bryan Kauffman, SFSU Director of Labor Relations, (2) Dean Sherwin, (3) Associate Dean Susan Shimanoff, (4) Interim Dean Daniel Bernardi, (5) Professor Gail Dawson (Chair of Art Department), and (6) Luby.  (*Id.* at 19:21-24).  The purpose of the meeting was to listen to Luby's concerns about Ellis and decide what, if anything, the University would do in response to those concerns.  Kauffman agreed to Luby's request for the meeting because:  "I would meet with anybody who asks."  (*Id.* at 16:12-14).

The meeting lasted approximately one hour.  (*Id.* at 20:15-16).  During the course of that meeting, Luby articulated the following complaints about Ellis:

- Ellis was unprofessional in her communication with Luby and Fogarty;

- Ellis was intimidating towards Luby and Fogarty;

- On a single occasion, Ellis told Luby to "shut up" and said "you will get yours";

- Some students made complaints about the timeliness of Ellis' review of theses.

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

(*Id.* at 24:16-27:7).  In response to Luby's complaints, Kauffman decided that Ellis should be required to undergo a psychological fitness for duty examination.  (*Id.*)  That decision was ratified by Dean Sherwin who was responsible for the budget allocation to pay for the fees associated with the exam.  (*Id.* at 27:8-25, 45:8-46:15).  Both Kauffman's decision and Dean Sherwin's ratification were made during the May 19 meeting and the decisions were final by the conclusion of the meeting.  (*Id.*)

### C.   KAUFFMAN DID NOTHING TO VERIFY LUBY'S COMPLAINTS OR INVESTIGATE ANY OF THE UNDERLYING FACTS BEFORE REQUIRING ELLIS TO UNDERGO THE FITNESS FOR DUTY EXAM

Ellis was not invited to the May 19 meeting.  Kauffman never met or spoke with Ellis while she was employed at SFSU.  (*Id.* at 14:2-25; Ellis Decl. ¶ 10).  At the meeting, Kauffman took Luby at his word. (Lebowitz Decl. Exh. D [Kauffman Depo at 35:4-22]).  He did not take any steps to verify if any of Luby's complaints were factually accurate.  (*Id.* at 35:23-36:16).  At no time did Kauffman ask Ellis for her perspective on the complaints.  (*Id.* at 54:19-55:4).  At no time did Kauffman interview Fogarty to verify Luby's characterizations of her interactions with Ellis.  (*Id.* at 34:15-35:3).  At no time did Kauffman interview any of Ellis' students to verify Luby's characterizations of their interactions with Ellis. (*Id.* at 52:2-14).  Luby did provide Kauffman with some emails which Luby claimed supported his complaints about Ellis, but Kauffman did not receive or review those complaints until *after* the conclusion of the May 19 meeting (*i.e.*, *after* he had already made the decision and had that decision administratively approved by Dean Sherwin).

Q.   When did you ask Dr. Luby to provide you with those e-mails?

A.   During the meeting on May 19.

Q.   And when did he actually provide you those e-mails?

A.   I believe it was within a few days.  I don't recall exactly when it was.

Q.   But in any event, it was sometime after the meeting was concluded?

A.   It couldn't have been before.

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA 94104

1   (*Id.* at 37:19-38:4).

2       In Kauffman's opinion, it was not his job to investigate the facts underlying Luby's

3   allegations.  (*Id.* at 35:3-36:17; 54:19-55:4, 57:2-58:5).  It was not his responsibility to verify that

4   what Luby was telling him was accurate.  (*Id.*)  In Kauffman's perspective, it was the fitness for

5   duty examiner's job to make that assessment; the fitness for duty exam was the place where Ellis

6   would have the opportunity to provide factual rebuttal to Luby's complaints.  (*Id.*)

7       **D.  KAUFFMAN REFUSED TO CONSIDER ELLIS' REBUTTALS AND
        REFUSED TO MEET WITH HER**

8

9       On May 22, Ellis emailed Kauffman.[2]  (Lebowitz Decl. Exh. E [AGO0065-AGO0066]).

10  After noting that she assumed there would be a meeting with Kauffman, she stated that Luby's

11  allegations were false.  (*Id.*)  She denied students had suffered any negative effects from her

12  work on their theses, offering to show Kauffman the "several hundred edited thesis chapters" in

13  her archives from the most recent three years.  (*Id.*)  She explained that Luby deliberately sent

14  crucial department communications to an email address he knew she did not regularly use.  (*Id.*)

15  And, she denied ever saying anything like "you'll get yours," explaining "that phraseology is

16  actually not part of my vocabulary."  (*Id.*)

17      In reply, Kauffman wrote:  "There is not a meeting with me in this process though."  (*Id.*

18  [AGO0065]).  Kauffman, for his part, refused to consider any of the facts relayed by Ellis and

19  refused to reconsider the decision to require Ellis to undergo the psychological fitness for duty

20  exam.  (Lebowitz Decl. Exh. D [Kauffman Depo 57:2-58:5]).

21      On May 28, Ellis sent Kauffman a memo entitled "Rebuttal to required 'medical

22  examination' & rebuttal to specific accusations."  (*Id.* at Exh. F).  Ellis opened her four-page

23  memo as follows:  "In further response to your letter of 20 May 2014, I cannot undergo the

24  medical examination scheduled for this Friday because there exist serious flaws and omissions in

25  your request."  (*Id.* [PL00059]).  After discussing the concept of informed consent in regard to

26  medical examinations, Ellis noted that the original notice of appointment did not identify the

27  _____

28  [2] This was the first time Ellis had ever had any interaction with Kauffman.  Prior to
    receiving his May 20 letters, she had never heard his name.  (Ellis Decl. ¶ 10).

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

type of exam to be performed.  (*Id.* [PL00059-PL00060]).  It was only after she conducted an

independent internet search that she discovered the designated medical examiner – Elliot

Henderson, Ph.D. – to be a psychologist from which she inferred the exam would be a

psychological examination. (*Id.*)  She then asked:  "exactly how is this psychologist supposed to

analyze whether or not I am capable of performing my job duties as a professor and museum

curator?"  (*Id.* [PL00060]).  She continued:

> Lastly, the medical examination must be a *business necessity only* to
> evaluate the performance of *my duties as a professor:  my ability to teach,
> advise students, evaluate term papers and Master's theses, and conduct
> research*.  The 'medical examination' is not a 'fishing expedition' to find
> any medical condition that *may* be contrived against, or even irrelevant to,
> the performance of my above-described duties.

*Id.* (italics in original).  Ellis concluded this part of the memo asking for specific information to

be provided by the University.  (*Id.*)

The next section of Ellis' memo addressed in greater detail her rebuttal to the factual

allegations made against her in the May 20 letters.  (*Id.* [PL00060-PL00061]).  She provided

more detail about the single verbal interaction with Luby, conceding she told him to "shut up,"

but again denying saying anything like "you'll get yours."  (*Id.*)  As she put it:  "I never spoke

the words, 'you'll get yours,' since this ungrammatical, illogical phrase is not part of my speech

pattern."  (*Id.*)

Kauffman replied bluntly.  "I do not intend to provide other documents to you.  The

instruction to attend the appointment is one given by an appropriate administrator of the

University.  I would recommend compliance with that instruction."  (*Id.* [AGO0069]).

Kauffman did not provide additional information because, as he testified, "I am not obligated

to."  (Lebowitz Decl. Exh. D [Kauffman Depo 68:15-21].

### E.  KAUFFMAN DID NOTHING TO ENSURE THAT THE FITNESS FOR DUTY EXAM WAS LIMITED IN SCOPE TO ASSESSING WHETHER ELLIS WAS CAPABLE OF PERFORMING THE ESSENTIAL FUNCTIONS OF HER JOB

Shortly after the conclusion of the May 19 meeting, Kauffman directed Diane Rosenfield

to contact Dr. Henderson to set up the fitness for duty exam.  (*Id.* at 39:11-40:2).  Kauffman

- 6 -

selected Dr. Henderson because he is the psychologist whom the University hires for all of their psychological fitness for duty exams.  (*Id.* at 38:25-39:10; Kauffman Decl. ¶ 5; Lebowitz Decl. Exh. G [Henderson Depo 29:1-14].).  The original appointment for the exam was set for May 30. (Lebowitz Decl. Exh. D [Kauffman Depo 72:15-18].).

At no time did Kauffman take any steps to communicate any limitations on the scope of the exam to Dr. Henderson.  (*Id.* at 40:3-41:7).  At no time did Kauffman do anything to learn any facts about Ellis' job duties.  (*Id.* at 43:17-45:4).  Kauffman did not know, and did nothing to learn, what type of program the Museum Studies Program was – i.e., graduate or undergraduate. (*Id.*)  Kauffman did not know, and did nothing to learn, how many classes Ellis taught.  (*Id.*) Kauffman did not know, and did nothing to learn, how many students Ellis supervised.  (*Id.*) Because he did not know any of these facts, Kauffman did not communicate any of these facts to Dr. Henderson.  (*Id.*)

## F.   SFSU DISCIPLINED, THEN TERMINATED ELLIS BECAUSE SHE REFUSED TO ATTEND THE FITNESS FOR DUTY EXAM

Ellis did not attend the scheduled fitness-for-duty exam.  (Lebowitz Decl. Exh. A [FAC ¶ 51]; *id.* at Exh. B [Answer ¶ 51].).  As a result, SFSU issued a formal Notice of Intent to impose disciplinary action against Ellis:  Three day suspension.  (*Id.* at Exh. A [FAC ¶ 55]; *id.* at Exh. B [Answer ¶ 55].).  SFSU articulated its "Reasons for Discipline" as follows:

> The California Code of Regulations states that an employee may be required to submit to an examination to evaluate whether the employee is able to perform the duties of the position.

(*Id.* at Exh. A. [FAC ¶ 57]; *Id.* at Exh. B [Answer ¶ 57].).  SFSU then set up another appointment for Ellis to undergo the fitness-for-duty exam, and again Ellis refused to attend as a continued violation of her civil rights.  (*Id.* at Exh. A [FAC ¶¶ 58-61]; *id.*  at Exh. B. [Answer ¶¶ 58-61].).  As a result, SFSU issued a "Notice of Intent of Dismissal."  (*Id.* at Exh. A. [FAC ¶62]; *id.* at Exh. B. [Answer ¶ 62].).  The University's stated reason for termination was Ellis' failure to attend the psychological examination.  (*Id.*)  SFSU subsequently confirmed its decision to

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

terminate Ellis' employment based on the reasons set forth in the Notice of Intent, effective

December 2, 2014.  (*Id.* at Exh. A. [FAC ¶ 63]; *id.* at Exh. B [Answer ¶ 63].)

## IV.  LEGAL ARGUMENT

### A.  THE LEGAL STANDARDS AT ISSUE: THE REHABILITATION ACT & FEHA

Title I of the ADA[3] and the FEHA impose identical restrictions on employers' ability to require employees to undergo medical examinations.  In particular, an employer may only require such exams if "shown to be job related and consistent with business necessity."  42 USC § 12112(d)(1),(4); 29 CFR § 1630.14(c); Cal. Gov. Code § 12940(f); 2 Cal. Code Regs. § 11071(d)(1).  The laws define "business necessity" as something that is "vital to the business." *Conroy v. New York State Dept. of Correct. Svcs.*, 333 F.3d 88, 97-98 (2d Cir. 2003); 2 Cal. Code Regs. § 11065(b).  This standard "is quite high, and is not to be confused with mere expediency." *Cripe v. City of San Jose*, 261 F.3d 877, 890 (9th Cir. 2001); *see also Kroll*, 763 F.3d at 623.  Moreover, the standard "is objective." *Brownfield*, 612 F.3d at 1146 (citing *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 518 (3rd Cir. 2001)).  Most importantly, "*[t]he employer bears the burden of demonstrating business necessity*." *Id.* (citations omitted) (emphasis added); *see also Ellis I*, 114 F. Supp. 3d at 887.  The Ninth Circuit explained that an employer must point to

> "*significant evidence* that could cause *a reasonable person* to inquire as to whether an employee is still capable of performing his job.  An employee's behavior *cannot be merely annoying or inefficient* to justify an examination; rather, there must be *genuine reason* to doubt whether that employee can 'perform job-related functions.'  . . . [A] fitness-for-duty exam . . . is not an excuse for every wide-ranging assessment of mental or physical debilitation that could conceivably affect the quality of an employee's job performance."

*Brownfield*, 612 F.3d at 1146 (quoting *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811-12 (6th Cir. 1999) (emphasis added)).  In other words, a psychological examination is not an "investigative tool."

---

[3] Section 504 of the Rehabilitation Act of 1973 directly incorporated the standards of Title I of the ADA, including the medical exam restrictions.  29 USC § 794(d); *see Ellis v. San Francisco State Univ.*, 136 F. Supp. 3d 1140, 1147 (N.D. Cal. 2015) ("*Ellis II*").

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

Even if an employer proves there is objective evidence that requiring an employee to undergo a medical exam is vital to the business, that is not the end of the inquiry.  The employer must also prove that the required exam is "job related."  42 USC § 12112(d)(4); Cal. Gov. Code § 12940(f); *Kroll*, 763 F.3d at 623 (employer's burden to prove the exam is job related); *see also Ellis I*, 114 F. Supp. 3d at 889.  To be job related, an exam must be "tailored to assess the employee's ability to carry out the essential functions of the job or to determine whether the employee poses a danger to the employee or others due to disability."  2 Cal. Code Regs. § 11065(k). Aside from some minor wording differences, the California regulations definition of "essential job functions" is identical to the definition found in the federal regulations.  *Compare id.* at § 11065(e)(1) *with* 29 CFR § 1630.2(n).  The California regulations further define the distinction between "essential" functions and those that are non-essential, referred to in the regulations as "marginal functions."

> "Essential functions" do not include the marginal functions of the position. "Marginal functions" of an employment position are those that, if not performed, would not eliminate the need for the job or that could be readily performed by another employee or that could be performed in an alternative way.

*Id.* at § 11065(e)(3); *see also* 29 CFR § 1630.2(n).  As explained by the EEOC, "[t]his provision permits employers to make inquiries or require medical examinations (fitness for duty exams) when there is a need to determine whether an employee is still able to perform *the essential functions of his or her job*."  29 CFR § 1630.14(c) App. (emphasis added).

SFSU's position in this case – borne out by its actions – renders the law meaningless.  An employer cannot willy-nilly require employees to undergo psychological examinations because it is curious or has some sort of subjective inkling that an employee might be impaired by a psychological condition.[4]  The law requires employers to take reasonable steps *prior to making a*

---

[4] Kauffman's testimony on this point is telling:  "I remember having the *impression* that there *may be* a health issue that was *maybe* at play with the situation, my recollection mostly being based on *some of the discussion* of her cancer history or tumor issue.  I am not sure if it was cancerous or not." (Gowe Decl. Exh. A [Kauffman Depo 26:6-10 (emphasis added).]). This was the extent of Kauffman's knowledge of any potential medical issue of Ellis.  And, it was inaccurate.  (Ellis Decl. ¶ 11.)

*decision* in order to ensure that a medical examination is justified.  The business necessity standard "is quite high, and is not to be confused with mere expediency."  *Cripe*, 261 F.3d at 890; *Ellis I*, 114 F. Supp. 3d at 888.  Contrary to the University's viewpoint, "mere doubt" is not enough in the Ninth Circuit.  *Def's Mot. P&A* at 17:9.

A psychological examination is not an "investigative tool" to be wielded at any time.  The ADA and FEHA are in place to ensure that employers do their diligence; that they do not use medical examinations as a substitute for personnel management.  Yet Kauffman described the University's approach to diligence in cases like this:

> Generally – the process that I go through when I am dealing with a fitness for duty issue *is not to investigate it to determine facts*. *I basically take the word of the individual bringing the issue to me*, I didn't have any reason to believe Dr. Luby was lying to me, and then basically allowing the mental health physician, provider, to make the assessment as to whether or not the person is fit or unfit to be at work

> If I am being provided inaccurate facts, then typically the person would be found fit and they would come back to work.

(Lebowitz Decl. Exh. D [Kauffman Depo 35:11-22 (emphasis added)].).  If it was not clear before, Kauffman repeated his approach:

> Q.     Prior to sending the letters that are reflected in Exhibit 1 [the May 20 letters], why did you not ask Professor Ellis for a meeting to ask her perspective on the issues that were being presented?

> A.     I believe I have already answered that.  I didn't believe it was necessary, and *it is not part of my process to try to determine facts for the basis for the concerns*. *I take the word of the individual who is bringing the concerns to my attention*.  If it turns out those were factually inaccurate, it typically would come out in the fitness for duty evaluation.

(*Id.* at 54:19-55:4 (emphasis added)).  Kauffman's process, then, is to abdicate the University's legal obligations and to instead invest the mental health examiner with such obligations.  It cannot be stated more plainly:  This process violates both federal and state law.  Kauffman's own admissions establish that the University cannot carry its burden in this case.

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

**B. SFSU CANNOT MEET ITS BURDEN TO PROVE THAT REQUIRING ELLIS TO UNDERGO A PSYCHOLOGICAL EXAMINATION WAS VITAL TO THE BUSINESS OF THE UNIVERSITY**

**1. SFSU's Contradictory Witness Declarations Cannot Support Its Burden**

The following is a comparison of Kauffman's declaration versus deposition testimony and the same for Dr. Henderson.

| DECLARATION TESTIMONY | DEPOSITION TESTIMONY |
| --- | --- |
| 1. Bryan Kauffman: "On or about May 19, 2014, I received copies of emails from Dr. Ed Luby, Director of the Museum Studies Program at the University. I relied on the information in the emails, in part, to make the recommendation and decision to require that Dr. Ellis attend a mental fitness-for-duty examination. True and correct copies of those emails are attached hereto as Exhibit A." <br><br> (Kauffman Decl. ¶ 2) | Q. When did you ask Dr. Luby to provide you with those e-mails? <br><br> A. During the meeting on May 19. <br><br> Q. And when did he actually provide you those e-mails? <br><br> A. I believe it was within a few days. I don't recollect exactly when it was. <br><br> Q. But in any event, it was sometime after the meeting was concluded? <br><br> A. It couldn't have been before. <br><br> (Lebowitz Decl. Exh. D [Kauffman Depo at 37:19-38:4]) |
| 2. Elliot Henderson, PhD: "I recall speaking to [Kauffman] before the first faculty fitness-for-duty examination, where we discussed the general job duties of University faculty." <br><br> (Henderson Decl. ¶ 3) | Q. So did anyone -- did you learn from any source as to what Professor Ellis' job duties were? <br><br> A. No. <br><br> (Lebowitz Decl. Exh. G [Henderson Depo 32:16-18]). |

Both of these statements go to material issues in this case. Kauffman's statements bear directly on a key issue for this Court to determine: What did Kauffman know and when did he know it? Dr. Henderson's statement bears directly on the key issue of whether the University took any steps to ensure that the psychological examination was tailored to assess whether or not Ellis

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA 94104

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

could perform the essential functions of her job.  Because the University's own witnesses contradict themselves on these material issues, SFSU cannot carry its burden and this motion should be denied.

**2. The Court's Inquiry as to "Business Necessity" Is Limited to What Bryan Kauffman Knew by the Conclusion of the May 19 Meeting**

In analyzing SFSU's ability to make out its burden of proof in this case, the Court must look to what information the decision-maker had when he decided to require the employee to undergo the medical exam as a condition of continued employment.  *Kroll,* 763 F.3d at 623 ("the individual who decides to require a medical examination must have a reasonable belief based on objective evidence that the employee's behavior threatens a vital function of the business." (citations omitted).)  In other words, the question is:  What did the decision-maker know, and when did he know it?  *Id.* ("the decision to require a medical examination was justified only if it was reasonably based on objective evidence known to [the decision-maker].); *see also id.* at 625 (the alleged conduct "may provide a basis for compelling a medical examination only to the extent [the decision-maker] was aware of it.").

Bryan Kauffman was the decision-maker in this case and he made that decision by the conclusion of the May 19 meeting.  (Lebowitz Decl. Exh. D [Kauffman Depo 24:16-27:25, 45:8-46:15]).  Kauffman testified that his decision was ratified and approved contemporaneously by Dean Sherwin.  (*Id.*)  As Kauffman explained, he made the substantive decision to require Ellis to attend the fitness for duty exam and Dean Sherwin approved the budget spend to enable that exam to take place. (*Id.*)  As a result, the Court's inquiry is limited to what Kauffman knew by the conclusion of the May 19 meeting.

**3. Kauffman's Decision Was the Definition of Expediency & Convenience, not "Business Necessity"**

A decision to send an employee to a fitness for duty exam is not lawful if it is reached as a "'mere expediency.'"  *Brownfield,* 612 F.3d at 1146 (quoting *Cripe,* 261 F.3d at 890.)  Nor may it be justified as a matter of convenience.  *Kroll*, 763 F.3d at 623 (citing *Conroy*, 333 F.3d at 97).  Nor may it be justified if the employee's behavior is merely annoying or inefficient.

*Brownfield,* 612 F.3d at 1146 (quoting *Sullivan,* 197 F.3d at 811-12.)  The decision-maker "must have a reasonable belief based on objective evidence that he employee's behavior threatens a vital function of the business."  *Kroll,* 763 F.3d at 623 (citations omitted).  In short, a fitness for duty exam cannot serve as a substitute for normal employee performance management.

### a)  Kauffman's Knowledge Was Based Entirely on What He Was Told by Luby at the May 19 Meeting

Luby was the only attendee at the May 19 meeting with any personal knowledge of the incidents of Ellis' alleged conduct.  Based exclusively on the allegations articulated by Luby during the meeting, Kauffman decided to require Ellis to attend the fitness for duty evaluation.  Kauffman took no steps to verify any of Luby's allegations.  He did not interview Ellis nor give her any opportunity to respond to the requirement that she attend the exam.  He did not interview Fogarty – the only other SFSU employee who might have personal knowledge of any of the alleged incidents.  He did not interview any students to explore the basis for any complaints.  Instead, he relied exclusively on Luby.  (Lebowitz Decl. Exh. D [Kauffman Depo 35:13-15 ("I basically take the word of the individual bringing the issue to me. . .").].  When Ellis did provide factual rebuttals to Luby's allegations, Kauffman declined to consider them. (*See supra* § III.D).  Instead, it was Kauffman's position that it was not his job to evaluate the facts; that was the psychologist's job.    (Lebowitz Decl. Exh. D [Kauffman Depo 35:8-22].).

The law requires the *employer* to reach a reasonable conclusion based on significant objective evidence.  *Brownfield*, 612 F.3d at 1146.  By definition, relying on a single source for allegations such as those being made by Luby is not reasonable.  Luby was not the primary source for allegations about interactions with Fogarty nor for allegations about student complaints.  Any decision-maker acting reasonably would take steps to seek out those primary sources of information and verify the second-hand statements made by Luby.  Any decision-maker acting reasonably would have interviewed the employee who is potentially being sent to a psychological examination.  Any decision-maker acting reasonably would not kick the can down the road, abdicating his responsibility to the psychologist performing the examination.

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA 94104

### b) Kauffman's Exclusive Reliance on Luby's Assertions Was Not Objectively Reasonable

The sum total of what Kauffman alleged against Ellis is as follows:

- Ellis was unprofessional in her communication with Luby and Fogarty;

- Ellis was intimidating towards Luby and Fogarty;

- On a single occasion, Ellis told Luby to "shut up" and said "you will get yours";

- Some students made complaints about the timeliness of Ellis' review of theses.

Even if fully credited, Luby's complaints do not give rise to objective evidence of a need for a psychological examination. Luby's complaints can be broken down into two categories: interpersonal relations among employees, and workflow management. When examined, the interpersonal interactions described to Kauffman at the May 19 meeting can fairly be characterized as, at most, "merely annoying." And, the timeliness issues can fairly be characterized as, at most, "inefficient." The Ninth Circuit has held that neither of these factors rise to the level of business necessity. *Brownfield*, 612 F.3d at 1146.

Taken separately, these issues are run-of-the-mill, day-to-day issues that arise in the workplace. Taken together, they indicate nothing more than a potentially dysfunctional workplace where employees do not get along with one another. The complaints raised by Luby at the May 19 meeting should have resulted in routine performance counseling, at most. SFSU had the resources available to engage in such counseling, but failed to draw on those resources. (Lebowitz Decl. Exh. D [Kauffman Depo 21:22-23:11].) Instead, it relied on expediency and convenience to address the issues raised by Luby. This, the law does not allow.

### c) SFSU Cannot Meet Its Burden Because If Kauffman Had Done His Diligence, He Would Have Learned There Was Not Objective Evidence To Support A Business Necessity

Again, Kauffman took Luby at his word. (*Id.* at 35:11-22, 54:19-55:4). He expressly was not interested in learning any more facts, leaving that for the psychologist to discover and assess. (*Id.*) If Kauffman had bothered to make even the most basic inquiry to verify Luby's assertions or confirm any of the facts he was being told, he would have learned a very different

- 14 -

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA 94104

1  story, and would have had reason to doubt the objectivity of Luby's characterizations of his and

2  Fogarty's interactions with Ellis over the years.

3      We begin with Luby's assertion – allegedly relied upon by Kauffman – that Ellis'

4  acknowledged Asperger's diagnosis was somehow connected to her alleged poor communication

5  with coworkers.  It is upon this assertion that SFSU argues that Ellis, herself, drew a connection

6  between her mental condition and the workplace conduct of which she was accused.  Had

7  Kauffman spoken with Ellis, he would have discovered Luby's report to be, at minimum,

8  suspect.  Ellis was diagnosed with this lifelong condition of Asperger's in 2011.  (Lebowitz Decl.

9  Exh. H [Ellis Depo 72:8-15]).  While Ellis' variety of Asperger's does manifest as difficulty with

10  interpersonal interactions, it is not the type that manifests as anger or uncontrolled outbursts. (*Id.*

11  at 73:24-77:6, 78:5-17).  Rather, it is characterized by being withdrawn and awkward in social

12  situations; not being able to read humor or peoples' feelings.  (*Id.*)  Moreover, Ellis never told

13  Luby that her Asperger's caused her to lose control of her temper or lash out in anger.  (Ellis

14  Decl. ¶ 12).  Had Kauffman done his basic diligence, he would have realized that whatever

15  connection Luby was drawing between his interactions with Ellis and Ellis' reporting of her

16  Asperger's diagnosis was, in fact, non-existent.

17      Similarly, a simple inquiry from Kauffman would have revealed that Ellis' brain tumor

18  (*i.e.*, a physical impairment) never manifested as any sort of impairment to mental functioning.

19  Ellis was diagnosed with a brain tumor in 2010.  (Lebowitz Decl. Exh. H [Ellis Depo 65:7-

20  72:7]).  This tumor developed as a result of exposure to fallout from the Chernobyl nuclear

21  disaster during which time Ellis was on an archaeological dig in the eastern mountains of

22  Romania. (Ellis Decl. ¶ 11).  The surgery was successful in removing the entire tumor.

23  (Lebowitz Decl. Exh. H [Ellis Depo 65:7-72:7]).  As a result of the tumor surgery, Ellis suffers

24  from hemianopia – partial peripheral blindness in her left eye.  (*Id.*)  There have never been any

25  other medical issues as a result of the tumor or the surgery and she has never indicated to anyone

26  at SFSU that she had suffered or was suffering any mental issues from this physical impairment.

27  (*Id.*)  As a result of the hemianopia, in 2011 Ellis registered with the Disability Programs

28

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

Resource Center ("DPRC") and sought reasonable accommodations to assist with some of her job duties.  (*Id.* at 62:4-63:17).  Had Kauffman bothered to speak with Ellis, he would have learned all these facts and his speculation that her tumor might be the cause of some sort of mental impairment (*see Def's Mot.* 2:19-21, 6:10-13) would have been erased.  Kauffman would similarly have discovered that – contrary to what he was allegedly told at the May 19 meeting – Ellis was registered with DPRC for this physical impairment.

Had Kauffman spoken with Ellis, he would have learned that Luby sent important work and scheduling information to an email address he knew Ellis did not review.  (Lebowitz Decl. Exh. H [Ellis Depo 147:12-153:8, 194:10-21]; *id.* Exh. I [Luby Depo 195:22-199:20]).  As Ellis explained in her deposition, she stopped regularly using her SFSU email address for important communications with staff and students because it had been compromised by spammers and hackers.  (*Id.* Exh. H [Ellis Depo 147:12-153:8]).  Sometime after becoming director of the program Luby decided (unilaterally, and without notice to Ellis) to only communicate with Ellis through her SFSU account and in March 2014 directed Fogarty to do the same.  (*Id.* Exh. L).

Had Kauffman interviewed Ellis, he would also have learned that Luby's reporting of Ellis' statement that Luby had "stabbed [her] in the back" was not nearly as nefarious as Luby made it seem.  While she did say the phrase, it took place in isolation sometime in 2012.  (*Id.* Exh. H [Ellis Depo 190:15-191:11].).  She made the statement during a conversation with Luby in which Ellis was asking why he went about taking over the director position in the manner in which he did.  The truth is that had been Ellis' idea – from the day she interviewed him for his initial hiring with the University in 2002 – that Luby take over as Director of the program.  In fact, she asked him directly to do so on at least two separate occasions over the years and Luby declined both times.  She also told Dean Sherwin this was her desire.  (*Id.* at 52:17-57:3).  Had Kauffman spoken with Ellis, he would have learned this information, taking the sting out of Luby's characterization of the interchange.

Had Kauffman done his diligence, he also would have heard a markedly different account of what took place in the hallway on March 3, 2014.  What he would have learned is that Ellis

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

1 was surprised to see the candidate in the hallway with Luby – that Luby had failed to provide

2 Ellis with notice of the candidate's visit.  (*Id.* at 192:7-195:5).  As Luby tried to dodge Ellis by

3 entering the men's bathroom, he leaned his head out to declare that he had provided notice to

4 Ellis to her university email. (*Id.*)  It was then that Ellis said "Oh, shut up" because she was

5 frustrated with Luby's email habits.  (*Id.*)  Hardly the scene that Luby described.

6        A conversation with Ellis also would have revealed to Kauffman a different story about

7 Luby's claim that she did not participate in review of student admissions.  (*Id.* at 197:18-203:5).

8 Kauffman would have learned that (1) Luby unilaterally changed the process while Ellis was on

9 sabbatical; and (2) Luby's refusal to provide Ellis with resources for one of her museum exhibits

10 caused her to be overworked to the point where she did not have any available time to assist in

11 the applicant review. (*Id.*)

12       Had Kauffman spoken with Ellis, he also would have learned about Ellis' approach to

13 theses.  (*Id.* at 220:22-234:8).  He would have learned Ellis' entire process and why she edited

14 theses in the manner that she did (*i.e.*, to ensure students had perfect writing samples as they

15 went out on the job market.)  (*Id.*) He also would have learned more context to the issues

16 surrounding timing of thesis review and the hurdles that Luby created by his own approach to

17 thesis review.  (*Id.*)

18       Finally, had Kauffman done any kind of investigation into the facts and circumstances

19 surrounding the relationship between Ellis and Luby, he would have discovered that Luby's

20 characterizations were overblown and not objectively reasonable.  For instance, Kauffman would

21 have seen examples of Ellis affirmatively engaging Luby and Fogarty in collegial and

22 collaborative discussions about departmental issues.  (*Id.* Exh. I [Luby Depo 180:11-188:19]; *id.*

23 Exhs. J, K).  And, had he followed up with Luby after seeing these correspondence, Kauffman

24 would have gained a window into Luby's own apparent paranoia – believing that by surveying

25 student preferences for class offerings Ellis was strategically ginning up a base of support to

26 corner and outfox Luby's desired course of action.  (*Id.*)

27

28

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

1    The above circumstances stand as a clear example as to why the law requires employers

2    to engage in diligence; to refrain from requiring medical examinations without first taking steps

3    to ensure that they are acting reasonably and relying on objective facts.  The most basic of

4    diligence – which Kauffman expressly refused to engage – would have revealed a very different

5    set of circumstances than was being presented by Luby.  Instead of taking these most basic of

6    steps, Kauffman took the expedient and convenient way out.  At most, this set of circumstances

7    would have given rise to intervention by human resources to try to work through the apparent

8    dysfunction of the program.

9         **d)  SFSU's Speculative Arguments Cannot Carry Its Burden of Proof**

10        If Kauffman's admissions and omissions are not enough to carry the day, then the

11   addition of the University's reliance on pure, unadulterated speculation must tip the decision in

12   Ellis' favor.  The University concludes the "Background" section of its brief as follows:  "Other

13   Information *Potentially* Provided to Mr. Kauffman."  *Def's Mot. P&A* at 12:8 (emphasis added).

14   The University opens this section with a demonstrably false statement:  "The material discussed

15   above is taken from documents given to Mr. Kauffman for purposes of determining how to

16   address problems with Dr. Ellis's [*sic*] workplace conduct at the May 19 meeting. . ."  *Id.* at

17   12:9-11.  As shown above, Kauffman's sworn deposition testimony establishes that he could not

18   have received those documents (the Luby emails) at the May 19 meeting.  *See supra* § IV.B.

19   From there, the University spends the ensuing two and one half pages engaged in wild

20   speculation that it knows cannot be the basis of carrying its burden.  Littered with phrases like

21   "may have been explained orally," the University compounds its speculation by incorporating

22   assumptions into subsequent speculation.  First, it states:  "Mr. Kauffman noted what *appears to*

23   *be* statements by Dr. Luby. . ."  *Def's Mot. P&A.* at 12:17 (emphasis added).  Then, the

24   University uses that assumption to reach its further speculation "It is unclear what emails Dr.

25   Luby is referring to in *that statement*. . ."  *Id.* at 12:19 (emphasis added).  This second statement

26   assumes that its original speculation – i.e., that Luby was the speaker being referenced in the

27   note – is correct, then goes on to make the completely irrelevant assertion that "there are other

28

- 18 -

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA 94104

emails beyond those provided to Mr. Kauffman that reference problematic behavior." *Id.* at 20-21. This further reference to "other emails" that are hearsay and not properly authenticated (*see* Objection to Evidence Nos. 8-9) is an inflammatory attempt to color the Court's view of this case. The University rounds out its argument on this point with yet more speculation: "Whether Dr. Luby was relying on this email . . . is unclear, but *certainly possible*, as he received it only a month earlier." *Def's Mot. P&A.* at 13:1-3 (emphasis added). This statement is, again, impregnated with the prior assumption that Luby was the speaker referenced in the notes. Then further speculates that it was "certainly possible" that he was referencing the cited email. This argument cannot be made, or received, with a straight face.

The University goes on through the ensuing pages to put forth several other presumed statements and communications. Making statements like: "Although it does not appear that he provided these emails to Mr. Kauffman. . ." then going on to reference and rely on them anyway. *Id.* at 13:6. Quoting testimony about an event "likely also in the Spring 2013" from a witness who was not at the May 19 meeting, then leaping to the assertion that Dean Sherwin "may have referenced this interaction" during the May 19 meeting. *Id.* at 13:25-26. Further relying on the false statement that the Luby emails were presented to Kauffman at the May 19 meeting, then speculating – based on its absence from Kauffman's notes – that nobody informed Kauffman that those emails were the entire universe of issues with Ellis. *Id.* at 14:5-8.

SFSU also litters its Opposition with allegations of misconduct that were clearly *never* communicated to Kauffman. Its citations to Fogarty's testimony is particularly suspect. Fogarty was not at the May 19 meeting. Kauffman never spoke with Fogarty about any of the issues related to Ellis. (Lebowitz Decl. Exh. D [Kauffman Depo 34:15-35:3].). As Kauffman testified, he "didn't believe it was necessary." (*Id.*)[5]

---

[5] Moreover, when we read the University's cited deposition excerpts, we see Fogarty's testimony is not nearly as damning as SFSU makes out. Instead of stopping at page 47, line 25, the Court should continue reading the entirety of page 48 and through page 49, line 2. That testimony contextualizes the situation and shows it was diffused quickly and nothing more came of it. Indeed, the trio of Luby, Fogarty, and Ellis proceed to the graduation ceremony without incident and Luby never even inquired if Fogarty felt unsafe or fearful. (Gowe Decl. Exh. L [Fogarty Depo 48:1-49:2].).

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

1    The University then doubles-down on these spurious, speculative arguments in the final

2 sections of its brief.  Intermingling a sprinkling of actual facts with other "facts" based wholly on

3 speculation and innuendo, SFSU castes unwarranted aspersions and lobs inflammatory rhetoric

4 at Ellis.  Indeed, the University's characterization of "escalation in misconduct and poor

5 performance" is pure hyperbole made without any reference to facts, real or imagined.[6]  The

6 University's assertion that Ellis "exploded at Dr. Luby" and told Luby "to 'shut up' repeatedly"

7 is irresponsible and false.[7]  All of this invective must be placed to one side as we employ

8 principled legal analysis to the admissible facts.  When we do so, what we see is an institution

9 that refuses to take seriously the obligations placed upon it by the United States Congress and

10 California Legislature.  What is clear from the University's moving papers is that the institution

11 believes it has every right to operate this way and, with this motion, seeks this Court's

12 endorsement of its conduct.  This Court should decline this invitation to gut the civil rights

13 protections of the ADA and FEHA; this Court should deny this motion.

14          **e)  SFSU's Failures Are Highlighted in Comparison to USF's**

15    SFSU's failure to consult with percipient witnesses and subject-matter-knowledgeable

16 people prior to referring Ellis to a fitness for duty exam is a fundamental error.  Contrast SFSU's

17 actions in this case with the actions of the university across the City.  The case of *Kao v.*

18 *University of San Francisco*, 229 Cal.App.4th 437 (2014) serves as a prime example of what

19 SFSU could have – and should have – done in this case in order to meet its burden of

20 establishing a business necessity for referring Ellis for the fitness for duty exam.  In that case, the

21 university received multiple first-hand complaints from multiple faculty members over the

22 course of a semester about Professor Kao's increasingly hostile and frightening behavior.  *Id.* at

23 ──────────────────────

24    [6] For example, the University purports to cite Ellis' "poor student evaluations for 2013
and 2014."  *Def's Mot. P&A* at 21:1-2.  However, the cited exhibit (Exhibit A to the Kauffman
25 Decl.) contains no student evaluations.

26    [7] Indeed, Ellis admits to saying "Oh, shut up" to Luby on a single occasion.  (Gowe Decl.
27 Exh. Exh. F [Ellis Depo 194:19]).  There is *no evidence*, however, that Ellis ever said anything
like that "repeatedly" to anyone, including Luby.

28

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA 94104

1  440-42.  The university opened an investigation and interviewed each of the faculty members

2  who had such experiences with Professor Kao.  *Id.* at 442-44.  Then, the university consulted

3  with a psychologist to obtain "'some input on an educational level about markers for violence or

4  things to look for that might suggest an escalation of hostilities . . . and how best for the

5  institution to respond.'"  *Id.* at 443.  The psychologist then met with the Assistant Vice President

6  and the Dean to discuss the issues.  *Id.*  The administration continued its investigation, meeting

7  with a forensic psychologist who recommended a fitness for duty exam.  *Id.*

8         Even at that point, however, the university had not made its final decision.  Rather, the

9  university held a meeting with Professor Kao and his attorney.  *Id.* at 444.  In that meeting, the

10 university officials gave Professor Kao a letter detailing much of what they had discovered in the

11 course of their investigation. *Id.* at 444-45. They informed Professor Kao that the university was

12 *considering* referring him to a fitness for duty exam, but had not yet made a final decision. *Id.*

13 Instead, the university wanted to hear from Professor Kao before making that final

14 determination.  *Id.*  The university administration followed up that meeting with an email

15 inviting, yet again, Professor Kao to provide "'any information you believe the University should

16 consider in making its decision on this matter. . .'"  *Id.* at 445 (quoting trial testimony).

17 Professor Kao declined to provide any information.  *Id.* The university *then* made the decision to

18 require Professor Kao to undergo a fitness for duty exam.  *Id.*  After months of back and forth

19 between the university and Professor Kao's attorney during which time Professor Kao refused to

20 attend the fitness for duty exam, the university terminated his employment.  *Id.* at 445-48.

21        Professor Kao filed suit challenging the lawfulness of the fitness for duty exam.  A jury

22 found in the university's favor and that verdict was upheld by the appellate court.

23        The *Kao* case lies in stark contrast to the present case.  Most importantly, the steps taken

24 by USF in making sure that it relied on reasonable, objective evidence in reaching its decision to

25 refer a faculty member for a fitness for duty exam is 180-degrees from what SFSU did in this

26 case.  USF conducted interviews with all percipient witnesses; SFSU relied on the hearsay

27 allegations of a single faculty member and failed to interview any other possible witnesses.  USF

28

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

consulted with two different outside experts to review the facts and get advice on how to approach the situation; SFSU consulted with nobody despite having Dr. Henderson at their disposal.  USF interviewed Professor Kao before making its decision; SFSU refused to meet with Ellis before or after making its decision.[8]  USF provided Professor Kao with a letter detailing the facts of the allegations against him and asked for him to provide any information that might shed a different light on their understanding of the facts; SFSU refused to consider the contrary facts submitted by Ellis describing the false statements made by Luby.  USF provided Professor Kao with information about the scope of the exam; SFSU refused to provide Ellis with any information about the scope of the exam, even though Dr. Henderson would have been happy to have done so.  In the end, the *Kao* case serves as an example of how an employer should go about meeting its obligations under the law.

What's more, Kauffman had subject-matter expertise at his disposal, but chose not to utilize it.  He could have called on Dr. Henderson to ask for his input in regard to the decision to refer Ellis for a fitness for duty exam.  SFSU had used Dr. Henderson at least 14 times over the prior 16 months to perform psychological fitness for duty evaluations.  (Kauffman Decl. ¶ 5.)  In regard to other employers, Dr. Henderson has been consulted prior to a fitness for duty referral in order to provide his professional opinion as to whether or not the employee should be referred. (Lebowitz Decl. Exh. G [Henderson Depo at 33:12-35:11].).  Instead of calling on this expert resource, Kauffman passed along the entire decision.  (Lebowitz Decl. Exh. D [Kauffman Depo 35:4-22].).  Kauffman's conduct is the very definition of convenience and expediency.

## C. SFSU CANNOT MEET ITS BURDEN TO PROVE THAT IT TOOK ACTIONS TO ENSURE THE MEDICAL EXAM WAS TAILORED TO EVALUATE ELLIS' ABILITY TO CARRY OUT THE ESSENTIAL FUNCTIONS OF HER POSITION

It is undisputed that SFSU did absolutely nothing to ensure that the medical exam was tailored to evaluate Ellis' ability to carry out the essential functions of her position.  The only

---

[8] This refusal is especially stark given Kauffman's sworn testimony:  "I'll meet with anybody who asks."  (Lebowitz Decl. Exh. D [Kauffman Depo 16:12-14].).

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

1   substantive communication – i.e., other than scheduling messages – that took place between

2   SFSU and Dr. Henderson was the single phone call and email from Diane Rosenberg in SFSU

3   human resources.  (Lebowitz Decl. Exh. G [Henderson Depo 26:15-27:2]).  The entire substance

4   of the phone call was Rosenberg telling Dr. Henderson "[t]hat they wanted to set up a fitness-for-

5   duty evaluation" and "[t]hat they would be electronically sending the information." (*Id.* at 27:10-

6   15).  The entire conversation took "[l]ess than one minute."  (*Id.* at 27:7-9).  The email from

7   Rosenberg was nothing more than a transmission message, attaching Kauffman's May 20 letter

8   to Ellis, the emails supplied to Kauffman by Luby *after* the May 19 meeting, one page containing

9   some handwritten notes from Luby, and a medical release form.  (*Id.* Exh. D [Kauffman Depo

10  60:13-22]).  These documents are a far cry from what Dr. Henderson typically receives from

11  employers referring an employee for a fitness for duty exam.  More typically, Dr. Henderson

12  receives documentation from the employer describing what he termed "critical job functions."

13  (*Id.* at Exh. G [Henderson Depo 16:10-17:8]).

14       During the Spring semester of 2014, Ellis had three core functions:  classroom teacher

15  and internship oversight, thesis advisor, and museum curator.  (Ellis Decl. ¶¶ 4-9).  As noted

16  above, Kauffman did nothing at all to learn anything about Ellis' job duties.  *See supra* § III.E.

17  He had no idea how many classes she taught, how many students she supervised, etc.  Kauffman

18  did not even know if the Museum Studies Program was a graduate or undergraduate program.

19  Being in the dark about Ellis' actual job duties, himself, he obviously could not – and did not –

20  give any such information to Dr. Henderson. (Lebowitz Decl. Exh. G [Henderson Depo 32:16-18

21  ("Q.    So did anyone -- did you learn from any source as to what Professor Ellis' job duties

22  were? A.    No.")].).

23       It is further undisputed that SFSU did nothing to ensure that the fitness for duty exam was

24  tailored in any way.  In Kauffman's view, that was not part of his job.  Even though Ellis

25  specifically asked Kauffman to inform her what the scope of the exam would be and to ensure

26  that it was tailored to her actual job responsibilities, Kauffman still did nothing.  Had he

27  inquired, Dr. Henderson would have willingly provided such information.  (*Id.* at 36:12-37:11).

28

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

1   What SFSU does submit in its motion are statements that are either directly contradicted

2   by sworn deposition testimony, or reflect communications so vague and remote that they cannot

3   meet the University's burden to establish job relatedness.  As noted above, Dr. Henderson's

4   declaration is materially false and directly contradicts his deposition testimony.  *See supra* §

5   IV.B.  Kauffman purports to vaguely remember a conversation in which he described the

6   "general" job duties of a SFSU faculty member to Dr. Henderson.  This statement cannot carry

7   the University's burden for several reasons.  First, it is entirely unspecific as to time or context.

8   We have no idea when this conversation took place in relation to May 19, 2014 except that it

9   took place sometime in 2013.  (Kauffman Decl. ¶ 8).   We have no idea in which department the

10  original faculty member worked.  We thus have no idea whether the description has any actual

11  relation to the essential functions of Ellis' job in the Spring of 2014.  Secondly, the statement is

12  hopelessly vague as to content.  Kauffman cannot recall any details of the conversation.

13  What we do know from Kauffman's description – and the University's subsequent

14  argument – is that the only substance communicated to Dr. Henderson was the "general job

15  duties" purportedly applicable to all SFSU faculty members.

16          I recall speaking to Dr. Henderson before the first faculty fitness-for-duty
17          examination in 2013, where we discussed the *general job duties* of University
            faculty.  My purpose in discussing the *general job duties* of faculty members at the
18          University was to ensure that Dr. Henderson had the necessary information to
            conduct the examinations in terms of determining whether the employee was
19          mentally fit *to perform those job duties*.

20  (*Id.* (emphasis added).).  This statement, alone, eliminates the University's ability to establish

21  that the examination was job related.

22  Dr. Henderson's declaration on this point similarly shows the University's failure.  Dr.

23  Henderson recalls a conversation with Kaufmann in which they "discussed the *general* job duties

24  of University faculty" for the purpose of ensuring that Dr. Henderson "had the necessary

25  information to conduct the examination in terms of determining whether the employee was

26  mentally fit to perform *those job duties.*"  (Henderson Decl. ¶ 3 (emphasis added).).  Again,

27  nothing about essential functions.  Again, no identification of which faculty member or in which

28

DUCKWORTH PETERS LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA  94104

1   department the particular faculty member worked.  Again, imprecision as to the timing of this

2   conversation.  In any event, both Kaufmann's and Dr. Henderson's declarations make one thing

3   crystal clear:  The University did *not* communicate with Dr. Henderson at any time about Ellis

4   and the *essential* functions of *her* job.  (*See also* Gowe Decl. Exh. A [Kauffman Depo 42:6-14].).

5   Thus, the University cannot meet an essential element of its burden.

6           We could find no authority addressing square-on an employer's obligation to ensure a

7   medical examination is job related.  The law *is* clear, however, that the employer bears the

8   burden to prove that such examination meets the legal standard.  In other words, the law requires

9   that employer must *do something* to make sure the medical exam is appropriately tailored to the

10  essential functions of the employee's job.  Here, it is undisputed that SFSU did *nothing*.  Indeed,

11  Kauffman purposefully did nothing.  According to Kauffman, that's not his job.  Federal and

12  state law hold otherwise.  Those laws place a firm duty on employers to take affirmative steps to

13  ensure that if they are requiring an employee to undergo a medical examination as a condition of

14  continued employment that any such exam is properly tailored.  2 Cal. Code Regs. § 11065(k);

15  29 CFR § 1630.14(c) App. (emphasis added); *Ellis I*, 114 F. Supp. 3d at 889.  In this case, SFSU

16  knowingly and purposefully wiped its hands of any such duty.  If the University is permitted to

17  escape liability in such a case, the law has no purpose.

18  **V.   CONCLUSION**

19          Because SFSU cannot carry its burden of proving both business necessity and job

20  relatedness, it cannot prevail on this motion.  Ellis respectfully requests that this Court deny the

21  motion.

22

23  Dated:  June 24, 2016                    DUCKWORTH PETERS LEBOWITZ OLIVIER LLP

24

25                                          By:___/s/ Noah D. Lebowitz_____,
                                                 Noah D. Lebowitz
26                                           Attorneys for Plaintiff Linda Ellis

27

28