KAMALA D. HARRIS, State Bar No. 146672
Attorney General of California
FIEL D. TIGNO, State Bar No. 161195
Supervising Deputy Attorney General
MICHAEL D. GOWE
Deputy Attorney General
State Bar No. 226989
 1515 Clay Street, 20th Floor
 P.O. Box 70550
 Oakland, CA  94612-0550
 Telephone:  (510) 622-2201
 Fax:  (510) 622-2121
 E-mail:  Michael.Gowe@doj.ca.gov
*Attorneys for Defendant Board of Trustees of the California State University*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **LINDA ELLIS,**<br><br>                                    Plaintiff,<br><br>     v.<br><br>**SAN FRANCISCO STATE UNIVERSITY, et al.,**<br><br>                                    Defendants. | C-15-02273-TEH<br><br>**DEFENDANT'S REPLY BRIEF IN SUPPORT OF PARTIAL SUMMARY JUDGMENT**<br><br>Date:            July 25, 2016<br>Time:            10:00 a.m.<br>Courtroom:   2<br>Judge:           Hon. Thelton E. Henderson<br>Trial Date:    N/A<br>Action Filed: May 20, 2015 |

**TABLE OF CONTENTS**

**Page**

ARGUMENT ................................................................................................................................. 1

    I.     The Undisputed Facts Establish That the Examination Would Have Been Job-Related, Had Dr. Ellis Undertaken It. ............................................................... 2

    II.    The Undisputed Facts Establish That the Examination Was Consistent with Business Necessity. ................................................................................................. 4

    III.   Response to Plaintiff's Objections to Evidence. ...................................................... 13

CONCLUSION ............................................................................................................................ 15

# TABLE OF AUTHORITIES

Page

**CASES**

*Brown v. City of Yakima*
    612 F.3d 1140 (9th Cir. 2010)..................................................................................................4

*Chedwick v. UPMC*
    2011 WL 1559792 (W.D. Pen. 2011) .......................................................................................4

*Conroy v. NY State Dep't of Correctional Svc.*
    333 F.3d 88 (2d Cir. 2003) ......................................................................................................11

*EEOC v. Prevo's Family Market*
    135 F.3d 1089 (6th Cir. 1998) ........................................................................................6, 7, 10

*Kao v. University of San Francisco*
    229 Cal.App.4th  437, 451 (2014) ..........................................................................................11

*Leonard v. Electro-Mechanical Corp.*
    36 F.Supp.3d 679 (W.D. Va. 2014) ............................................................................6, 11, 12

*Rodriguez v. Loctite Puerto Rico, Inc.*
    967 F.Supp. 653 (D. P.R. 1997) ................................................................................................6

*Roe v. Catholic Health Initiatives of Col.*
    2012 WL 12840 (D. Col. 2012) ................................................................................................4

*Sullivan v. River Valley School Dist.*
    197 F.3d 804 (6th Cir. 1999) ....................................................................................................2

*Tice v. Centre Area Trans. Auth.*
    247 F.3d 506 (3d Cir. 2001) .....................................................................................................2

*U.S. v. Arteaga*
    117 F.3d 388 (9th Cir. 1997) ..................................................................................................14

**STATUTES**

42 U.S.C. § 12112(d) .......................................................................................................................4

**RULES**

FRE 401 ..........................................................................................................................................14

FRE 801 ..............................................................................................................................13, 14, 15

FRE 803 ..........................................................................................................................................14

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Local Rule, 7-3(a) ....................13

**OTHER AUTHORITIES**

*EEOC, Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act*, No. 915.002 (July 27, 2000) ....................7, 10

**ARGUMENT**

Nothing raised in Dr. Ellis's opposition to the University's motion for partial summary judgment supports or warrants denial of the motion. Her primary focus in attacking the veracity of some of the details provided to the decision-maker here, Bryan Kauffman, misses the point.

For the decision to require Dr. Ellis to undertake a fitness-for-duty examination to be valid, the examination must be "job-related" and "consistent with business necessity." Dr. Ellis offers no substantive dispute as to the job-relatedness of the examination. First, she never submitted to an examination and her claim that the exam *would not have been* job-related is based on mere speculation. Second, the undisputed evidence provided by the parties demonstrates that the examination would have indeed been job-related, as it was limited to testing whether she was mentally fit to do her job.

Dr. Ellis also attempts to cast the examination decision as lacking business necessity by asking the court to adopt a new, more stringent standard for business necessity that is not supported by applicable law. The standard for determining whether the decision was consistent with business necessity is whether the decision was objectively reasonable. In making this determination, the courts look to what information was supplied to the decision-maker in making the decision and whether that information reasonably led to the resulting directive to take the exam. The standard that Dr. Ellis asks the court to adopt—requiring the decision-maker to independently verify the information through an investigation and interactive process with the employee—goes beyond what any court has previously required.

Here, the evidence shows that the information provided to Mr. Kauffman reasonably led to his decision to require the examination. Dr. Ellis had disclosed mental health conditions that could have been the source of disruptive workplace conduct and there was no basis to conclude that the information provided to him was not accurate. The goal of the examination was to determine whether there was a mental impairment affecting Dr. Ellis's ability to do her job; the result would aid in deciding how to best proceed, such as an effort in finding potential accommodations to help her effectively do her job or one that may potentially lead to disciplining her or otherwise changing her job duties.

In this context, the Court should grant the University's motion. The University's decision to require the fitness-for-duty examination was a reasonable step in the process of addressing serious workplace concerns centered around Dr. Ellis. The University's decision was therefore completely consistent with the Rehabilitation Act, the ADA, and the FEHA.

## I. THE UNDISPUTED FACTS ESTABLISH THAT THE EXAMINATION WOULD HAVE BEEN JOB-RELATED, HAD DR. ELLIS UNDERTAKEN IT.

In her opposition, Dr. Ellis avoids the critical facts that establish that the University's examination was job-related and instead relies on pure speculation and conjecture to allege that the exam *would have been* outside the permitted scope. The key characteristics for job-relatedness are simple: the examination must be limited to testing whether the employee is mentally capable of performing her job. *See Tice v. Centre Area Trans. Auth.,* 247 F.3d 506, 515 (3d Cir. 2001) ("an examination that is 'job-related' and 'consistent with business necessity' must, at minimum, be limited to an evaluation of the employee's condition only to the extent necessary under the circumstances to establish the employee's fitness for the work at issue"). The undisputed facts show that Dr. Ellis's examination, had she taken it, would have been job-related, as was consistent with the University's and examining psychologist's past practice.

Dr. Ellis never took the examination, however, and cannot establish it would not have been job-related had she taken it. *Sullivan v. River Valley School Dist.,* 197 F.3d 804, 812 (6th Cir. 1999) ("Since Sullivan never submitted to the examinations, he precluded himself from being able to establish a genuine issue of material fact as to whether the exams were related to his job, or were too broad in scope."). Moreover, the key fact that she overlooks in opposing summary judgment is her own involvement in the examination process. Dr. Henderson, the examining psychologist, testified that he forms the examination around the feedback that he receives not just from the school, but from the employee's own description of her job duties:

> I did not exclusively rely on the job duties for faculty as described by Mr. Kauffman to determine job functions of a faculty member. It is my practice to have the employee complete a questionnaire in my office before conducting any interview or using any other tools to examine the employee. As part of that questionnaire and in my follow up interview with the individual, I would learn more about the employee's particular job duties as the employee understood them. It is important to go beyond general job duty descriptions and find out what the employee actually did regularly so

as to better examine the employee's competence for the particular work he or she does. I would have done the same with Dr. Ellis had she attended her appointment with me, and relied on Mr. Kauffman's previous explanation of faculty job duties, Dr. Ellis's understanding of her job duties in practice, and my experience generally in conducting such examinations for the University to determine whether there was any psychological impediments to her ability to perform her job duties.

Henderson Decl., Doc. 47-6, ¶ 4.

In Dr. Ellis's case, there were no written job duties for faculty. Bryan Kauffman, the University decision-maker requiring Dr. Ellis's examination, and Dr. Henderson both testified that they had discussed the job duties of faculty generally in advance of Dr. Henderson's first faculty examination. Henderson Decl., Doc. 47-6, ¶ 3; Kauffman Decl., Doc. 47-4, ¶ 8. Had Dr. Ellis attended the examination, Dr. Henderson would have learned about Dr. Ellis's particular duties in the Museum Studies Program from her directly.[1] Dr. Ellis has provided no contrary evidence and therefore is unable to establish that the nature of the examination would have been anything other than consistent with Dr. Henderson's practice.

Moreover, Dr. Ellis cannot dispute that the only substantive information that Dr. Henderson would have provided to the school after examining Dr. Ellis is whether Dr. Ellis was capable of performing her job at the University. Dr. Henderson made clear that this is not only his practice, but what he informed Mr. Kauffman that he would do from the outset of his relationship with the school. Henderson Decl., Doc. 47-6, ¶ 2; Kauffman Decl., Doc. 47-4, ¶ 7. In this way, the examination process fully comports with the ADA and the FEHA—the only question posed by the examination, and the only matters the University would have tested, are whether Dr. Ellis was mentally impaired from performing her work. This is the very definition of job-relatedness.

---

[1] Dr. Ellis attempts to fashion a contradiction between Dr. Henderson's testimony in deposition and that in his declaration filed with the University's moving papers here. *See* Ellis MPAs in Opposition, Doc. 55, p. 11. There is no contradiction. In his deposition, Dr. Henderson was asked only whether he was ever provided with Dr. Ellis's specific job duties. He wasn't. But he *was* provided with job duties that are generally applicable to faculty—and this is consistent with Mr. Kauffman's deposition testimony, cited in the University's moving papers and ignored in Dr. Ellis's opposition. *See* Gowe Dec., Doc. 47-1, Ex. A, p. 41:15-23. Had Dr. Henderson been asked if he'd been provided with job descriptions for faculty generally, discounting any particular role each professor had in a given department, he would have answered yes, as he and Mr. Kauffman both explain—the former in this declaration and the latter in his declaration and the deposition testimony cited above. Dr. Ellis's purported contradiction is merely a reflection of incomplete questioning during Dr. Henderson's deposition and, thus, no contradiction at all.

1  II.  **THE UNDISPUTED FACTS ESTABLISH THAT THE EXAMINATION WAS CONSISTENT WITH BUSINESS NECESSITY.**

The undisputed facts show that Mr. Kauffman's decision to require Dr. Ellis to undertake a fitness-for duty examination was objectively reasonable, given the information that was provided to him. That is, the information provided to Mr. Kauffman—by way of the May 19, 2014 meeting with University administrators to discuss Dr. Ellis's conduct and performance—reasonably led Mr. Kauffman to conclude that a mental health examination of Dr. Ellis was the appropriate next step in resolving the ongoing disruption within the Museum Studies Program. In her opposition, and her lawsuit as a whole, Dr. Ellis misconstrues this objective standard to require something more from the decision-maker than reliance on objectively reasonable information supporting an examination.

Under the enhanced standard Plaintiff asks the court to adopt, not only must the information provided to the decision-maker reasonably lead to the examination decision, the decision-maker must also have independently investigated the veracity of all of the information provided to him, including consulting the employee separately, even where there was no reason to doubt the veracity of the information. Nothing in the ADA or the FEHA requires this of an employer, however—and for good reason.

The purpose of 42 U.S.C. § 12112(d) "is to stop employers from discovering an employee's disability and thereby preventing discrimination on the basis of that disability." *Roe v. Catholic Health Initiatives of Col.,* 2012 WL 12840 at *3 (D. Col. 2012); *Chedwick v. UPMC,* 2011 WL 1559792 at *11 (W.D. Pen. 2011) ("The primary purpose of this restriction is to prevent covered employers from using unjustified medical examinations and inquiries to discover or expose medical information that could stigmatize disabled employees."); *see also Brown v. City of Yakima,* 612 F.3d 1140, 1146 (9th Cir. 2010) ("Section 12112(d)(4)(A) prohibits employers from using medical exams as a pretext to harass employees or to fish for nonwork-related medical issues and the attendant unwanted exposure of the employee's disability and the stigma it may carry."). Examinations that are premised on unnecessary exposure of an employee's disability are therefore prohibited by the ADA and not objectively reasonable.

4

But there was no threat of unnecessary exposure of a mental health condition here; nor is there any allegation of University bias against her for a mental health condition or the failure to accommodate such a condition. Dr. Ellis does not assert that either Dr. Luby or Mr. Kauffman was biased against her due to her disabilities, mental or physical. She does not claim or provide any evidence that Mr. Kauffman made the decision to require the examination for any purpose other than to determine whether she was mentally impaired from performing her job. Dr. Ellis does not accuse the University or Mr. Kauffman of using the fitness-for-duty examination to punish her for having a disability or to otherwise negatively impact her employment at the University due to any disability. To the contrary, the evidence shows only that the members of the May 19 meeting were attempting to address the problematic workplace conduct and performance that was raised by Dr. Luby, and in light of a mental condition that Dr. Ellis had raised to the University herself. In fact, Mr. Kauffman's testimony shows that the University has strived to address mental conditions that impact faculty performance by keeping the faculty member employed and using the results to the examination to facilitate accommodations. Kauffman Decl., Doc. 47-4 ¶ 6; *see also similar Shimanoff testimony*, Gowe Decl., Doc. 47-1, Ex. B, pp. 22:4-23:25.

Dr. Ellis also does not claim that Mr. Kauffman used the examination process to uncover whether she had some sort of disability. This is because it is undisputed that Dr. Ellis had *already* disclosed her diagnosis of Asperger's Syndrome, and the fact that she had had a brain tumor removed, to Dr. Luby and Deans Sherwin and Shimanoff before the May 19 meeting. And there is no dispute that Dr. Henderson's practice was to limit the information that he provided to the University to whether the employee is disabled from doing her job—the underlying mental health condition, if any, would not be "exposed" to the school. Thus, the University's decision-making process for Dr. Ellis's examination was consistent with the purpose behind the ADA's and the FEHA's examination provisions.

In her opposition, Dr. Ellis ignores the impact that her disclosed mental health conditions have on the analysis of whether the University's examination decision was consistent with business necessity. But courts do not ignore this key factor. The Sixth Circuit explicitly

5

recognized the primacy of this factor in deciding that an employee's mandated fitness-for-duty examination was consistent with the ADA:

> [Employer] Prevo's behavior is not based on a mere suspicion that [employee] Sharp may be sick. Rather, Sharp has directly communicated his alleged HIV status to Prevo's. This is not the sort of unfounded and biased discrimination that the ADA was created to prevent. . . . Part of the concern of the Congress in creating the ADA and the ability of employers to require employees to undergo medical examinations was the unwanted exposure of the employee's disability and the stigma it may carry . . . In the present case, Sharp has already identified himself to Prevo's as HIV positive and planned to identify himself further by discussing HIV and AIDS at a local high school.

*EEOC v. Prevo's Family Market,* 135 F.3d 1089, 1094 (6th Cir. 1998).

Likewise, in another case, the district court ruled that the "correlation between the plaintiff's request for medical leave and the defendant's request of the medical exam, *in light of the defendant's past awareness of the plaintiff's alleged Lupus condition* make it clear that the defendant did not request the exam for the sole purpose of trying to determine 'whether [the plaintiff] suffered from a particular disability [and] that the defendant harbored [n]either a special bias against individuals with a given disability [n]or a general bias against all persons with disabilities.'" *Rodriguez v. Loctite Puerto Rico, Inc.,* 967 F.Supp. 653, 661 (D. P.R. 1997). In this context, the court concluded that where such "a medical examination serves to determine an employee's ability to perform her job, the ADA would not prevent the plaintiff's employer from requesting the examination." *Id*.

This "correlation," between problematic employee conduct and the employer's knowledge of potential health conditions that may be the source of the employee's conduct, is the very basis for determining that the examination was objectively reasonable. This is because "an employer cannot be expected to understand the symptoms or ramifications of the medical conditions of its employees and must be allowed to have such conditions examined by a medical professional." *Leonard v. Electro-Mechanical Corp.,* 36 F.Supp.3d 679, 687 (W.D. Va. 2014). In this way, the "provision of the ADA allowing medical examinations for the evaluation of an individual's ability to perform job-related functions ... provides protection to both employers and employees." *Id*.

The parties agree that employers must base a decision to perform a medical examination on objective information. Where Dr. Ellis's argument fails, however, is the heightened due process-type standard she claims employers must satisfy in order to demonstrate the information is reasonably objective. Plaintiff alleges that the University should have performed an independent investigation, including consultations with Dr. Ellis, before concluding that a medical examination was appropriate. Such a standard has no support in the law. To the contrary, objective evidence need not result from a fact-finding or investigatory process but can be based in whole or in part on information learned from employees or third parties. *See EEOC, Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act*, No. 915.002 (July 27, 2000), note 6.

Here, Mr. Kauffman was told at the May 19 meeting that Dr. Ellis was diagnosed with Asperger's Syndrome and had suffered from a brain tumor previously. Kauffman Dec., Ex. B (AGO-1220). He was also informed that Dr. Ellis had displayed mental instability in a manner that was disruptive to her colleagues and left Dr. Luby, director of the program, unsure of her fitness to continue, given how quickly she had switched from angrily accusing him of "stabbing her in the back" to "sobbing, shaking, and [being] almost unable to stand." Mr. Kauffman was told that Dr. Ellis herself had connected this behavior to her Asperger's Syndrome—in particular, Mr. Kauffman was informed that Dr. Ellis had explained to Dr. Luby that the Asperger's Syndrome "accounts for why she is unable to control her temper, and why she doesn't understand the impact that her words and actions have on others." Kauffman Dec., Doc. 47-4, Ex. A (AGO-1031). Dr. Luby, in a January 2014 email provided to Mr. Kauffman, further noted that:

> Specifically, in revealing her Asperger's diagnosis to me, she indicated that she [is] unable to control her anger in written and verbal communication, that it is deeply upsetting to her that colleagues and students are afraid of interacting with her, and that she realizes that her negative behavior is often unforgiveable."

Kauffman Dec., Doc. 47-4, Ex. A (AGO-1032). And there is no dispute that Dr. Ellis's Asperger's Syndrome does in fact cause her to have difficulty in interpersonal interactions. *See*

Ellis Opposition, Doc. 55, p. 19:9-10.[2] At the same time, Mr. Kauffman was told, Dr. Ellis refused Dr. Luby's offer for administrative assistance to help her effectively work despite the effects of her condition. Kauffman Dec., Doc. 47-4, Ex. A (AGO-1031).

Dr. Luby provided other emails to Mr. Kauffman that he had received from multiple Museum Studies students, describing their concerns about the failure to receive timely feedback from Dr. Ellis, including the lack of any response from Dr. Ellis at all and the students' fear that they would not graduate on time.[3] Kauffman Decl., Doc. 47-4, Ex. A (AGO-1041 to AGO-1052). These emails are dated both from the weeks immediately preceding the May 19 meeting, as well as one from the 2013 graduation period, and they illustrate the types of complaints Dr. Luby had been receiving from students about Dr. Ellis.

Mr. Kauffman was also informed how Dr. Ellis approached Dr. Luby and a candidate for a tenured faculty position in the program while they traversed a hallway. Dr. Luby described in an email, also provided to Mr. Kauffman, how Dr. Ellis stopped the two of them on their way to the restroom, and that she was upset that the candidate had not been scheduled to arrive on a date that

---

[2] Whether Dr. Ellis's angry outbursts, such as those discussed below telling Dr. Luby to "shut up!" or in causing Christine Fogarty to cry, are caused by her Asperger's Syndrome or something else is a question for the University to reasonably rely on a third party mental health expert to answer. *See* Leonard, 36 F.Supp.3d at 687 ("an employer cannot be expected to understand the symptoms or ramifications of the medical conditions of its employees and must be allowed to have such conditions examined by a medical professional").

[3] Again, Dr. Ellis attempts to manufacture a contradiction in Mr. Kauffman's testimony when there is none. *See* Ellis Opposition, Doc. 55, p. 11. Mr. Kauffman testified in his deposition that, nearly two years after the May 19 meeting, he is unsure when he received the emails from Dr. Luby: "I don't recollect exactly when it was." He knew it wasn't before the meeting, but that it may have been within the days after. In his declaration, he notes merely that he received them "on or about May 19." Thus, Mr. Kauffman simply cannot recall when he first received the emails. Dr. Luby, however, recalled specifically bringing the emails to the May 19 meeting. *See* Gowe Decl., Doc. 47-1, Ex. C, p. 93:17-20; pp. 94:9 to 96:24. Given that Dr. Luby originated the documents and concretely recalls bringing them, it is clear that Dr. Luby had them with him during the meeting.

In any event, Mr. Kauffman did not notify Dr. Ellis of the suspension until the next day, and his May 20 letter to Dr. Ellis includes information that his notes from the meeting do not. In the May 20 letter, Mr. Kauffman references March 3, 2014 as the date that Dr. Ellis told Dr. Luby to "shut up!"—that date is not in his notes. Presumably, Mr. Kauffman had the emails available to him when he wrote the May 20 letter and relied on the email for the date. *Compare* Kauffman Decl., Doc. 47-5 (exhibits), Ex. B (notes) *with* Ex. A (email) (AGO-1029). Moreover, Mr. Kauffman certainly had the emails during the six-month period that Dr. Ellis was suspended, at each step of the disciplinary process that she was suspended again and rescheduled for a new examination. Mr. Kauffman clearly relied on the emails to decide to place her on suspension and require her to undertake the fitness-for-duty examinations.

8

she apparently preferred.  Dr. Luby further described how Dr. Ellis proceeded to suddenly shout at him to "shut up!," in front of the candidate, as Dr. Luby attempted to explain how he had worked to include her in the decision-making about the timing for the candidate's visit.  Dr. Ellis, according to Dr. Luby's email, then yelled a parting shot, of something to the effect of, "you'll get yours!"  Kauffman Dec., Doc. 47-4, Ex. A (AGO-1029).  Beyond explosive behavior by Dr. Ellis in her interactions with Dr. Luby, the emails show that Dr. Ellis also engaged in similar behavior with the program's staff member, Christine Fogarty.  According to an April 18, 2014 email provided by Dr. Luby to Mr. Kauffman, Dr. Ellis is described to have had "a very bad interaction" with Ms. Fogarty, leaving Ms. Fogarty "sobbing" to Dr. Luby on the phone.  Kauffman Dec., Doc. 47-4, Ex. A (AGO-1038).

The notes taken by Mr. Kauffman during the May 19 meeting reflect all of these incidents and more.  In one note, Mr. Kauffman records:  "Thought she was coming to class inebriated, medicated, being late, missing classes.  AOC [Christine Fogarty] asked to step in and work on classes" and "AOCs were asked several times to teach class.  Stressful because she worked for Linda directly.  AOC was a periodic lecturer." *Id*.

In terms of student relations, Mr. Kauffman heard from one or more of the attendees that Dr. Ellis was not fulfilling her role as a reader or chair to provide feedback and approve graduate student theses in the program. *See, e.g.,* Gowe Dec., Doc. 47-1, Ex. A, p. 37:3-9.  This, in turn, created a high level of stress for these students—they needed the feedback to complete the theses and her signature was needed for the theses to be deemed final, or the students would be unable to graduate:

- "Not paying attention to theses.  Raised anxiety about not graduating.  Not getting timely feedback.  They would ask me to manage it."  Kauffman Decl., Doc. 47-4, Ex. B.

The notes further reference the pattern of ongoing, disruptive behavior by Dr. Ellis:

- "Went through this scenaio [sic] a year ago.  Issue last summer.  Implemented workarounds then.  DIdn't [sic] put her on as many theses.  Changed classes to address her teaching deficiencies."

- "This semester she chaired 6 theses and sat on 4 more. This was a lower percentage than in prior years."
- "Level of anxiety for students was very high. Non-stop e-mails. Gave tyhem [sic] a lot of advice. Ann H[allum, Dean of Graduate Studies] found this unacceptable. She then allowed me to sign them. I am doing all the substantive work."

Kauffman Dec., Doc. 47-4, Ex. B.

Mr. Kauffman's notes further detail how Dr. Ellis shouted at Dr. Luby and otherwise engaged in strange behavior—representing a shift in her work behavior:

> She is a bully. She is rude and inappropriate. I have some e-mails which demonstrate. She didn't show for search committee meetings. I arranged an interview for 1st candidate. She didn't show up. Won't respond to certain e-mails. She then manically comes down hallway to me with candidate. Introduces herself. Said she didn't know about interview. Told her that she had been informed. She then yelled 'Shut up' at me in front of candidate. I moved away and she continued to be over the top. It really upset him. Yelled it again. Student assistant heard this as well. She then said, you'll get yours. This happened this spring. First time that she ever yelled at me."
>
> More common will be that she comes in and starts yelling. I have never yelled back. THen will sob.

Kauffman Dec., Doc. 47-4, Ex. B.

Taken together—disclosure of Asperger's Syndrome and a recently treated brain tumor, as well as the information regarding numerous incidents indicating instability and potentially actionable poor performance and misconduct, all as reflected in the contents of Mr. Kauffman's notes, the emails provided by Dr. Luby, and the nature of the May 19 discussion testified about by Mr. Kauffman, Dr. Luby, and Dean Shimanoff—there was an objectively reasonable basis for Mr. Kauffman to conclude that it was necessary for the University to obtain an opinion from a mental health expert as to whether there was any mental impairment causing the above-described disruption by Dr. Ellis. *See, e.g., EEOC, Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act*, No. 915.002 (July 27, 2000), note 6, example C (stating that it was objectively reasonable for an employer to require an employee to undergo a medical exam based on complaints from several customers that

the employee's performance and communication skills had declined possibly due to a hearing problem).

That the examination was the proper investigative tool for this purpose is supported by federal law: "The employer need not show that the examination or inquiry is the only way of achieving a business necessity, but the examination or inquiry must be a reasonably effective method of achieving the employer's goal." *Conroy v. NY State Dep't of Correctional Svc.,* 333 F.3d 88, 98 (2d Cir. 2003). The University's goal here was to determine whether a mental health condition may be responsible for Dr. Ellis's conduct. As noted above, it is important for the University to be able to seek the advice of a third party expert, such as Dr. Henderson, in order to objectively determine whether Dr. Ellis was mentally impaired in performing her work. *See Leonard,* 36 F.Supp.3d at 687 ("an employer cannot be expected to understand the symptoms or ramifications of the medical conditions of its employees and must be allowed to have such conditions examined by a medical professional"). The result of this inquiry with an objective expert would determine which steps to take moving forward: potential discipline, counseling, or changes in job duties on one hand, and potential workplace accommodations on the other.

Much of Dr. Ellis's briefing in opposition to the University's motion is devoted to attacking the veracity of the information provided to Mr. Kauffman and, in turn, to advocate for an expansion of the standard for determining whether the employer's decision to require the examination was consistent with business necessity. In particular, Dr. Ellis argues that she disagrees with some of the information provided to Mr. Kauffman, and that this disagreement means that the University should have consulted her before deciding to require the examination for its decision to be objectively reasonable. But the law does not require that the employer consult with the affected employee before mandating a fitness-for-duty examination in order for it to be valid. To the contrary, courts have held that no such interactive process is necessary.

In *Kao v. University of San Francisco*, the court held that the FEHA does not require that the employer engage in the interactive process in conjunction with a mandatory fitness-for-duty examination where the employee has not sought a workplace accommodation for a related mental or physical condition. 229 Cal.App.4th 437, 451 (2014). As with the professor in *Kao*, Dr. Ellis

11

here has never sought accommodation or assistance for Asperger's Syndrome or any other mental health condition despite the opportunity to do so. As such, no statutorily required interactive process is required where reasonable accommodations have not been requested. *See id*. Likewise, courts have held that consultation with the employee before requiring the examination is not required under the law, even where the employee claims his or her side of story would have obviated the need for the examination. *See, e.g., McLeod,* 2016 WL 1260691 at * 5 ("The EEOC argues that if Defendant had merely asked [employee] Whitten the reason for her recent falls, there would have been no need for the medical exams. However, the EEOC cites no authority stating that such an interrogation is required, and this argument does not preclude finding summary judgment appropriate here."). Moreover, the "mere fact that" the employee "believed that he was still capable of performing the essential functions of his job… is simply not relevant to whether the defendant could request a medical examination under the ADA." *Leonard*, 36 F.Supp.3d at 687.

Here, Dr. Ellis took multiple opportunities to rebut the May 20 letter informing her of the bases for the suspension and examination. *See* Amended Complaint, Doc. 14, pp. 5-8 (e.g., ¶ 44, "The remainder of Ellis' May 28 letter provided detailed factual rebuttals to the reasons articulated by Kauffman in his May 20 letter setting forth SFSU's purported justifications for its decision to temporarily suspend Ellis and require her to undergo the medical examination"). She countered the assertions made in the May 20 letter and further attacked the credibility underlying it. Dr. Ellis's voice was heard in this way over the approximately six-month period before she was ultimately terminated for failing to comply with the examination directive. Had the University determined that, at any point during that time, Dr. Ellis had provided information that warranted further investigation or review, it could have met with her and otherwise lifted her suspension. Nothing provided to the University by Dr. Ellis, however, warranted any such change in course, and nothing in the law required the University to obtain additional information from Dr. Ellis in continuing to require that she attend the examination.

The law only provides that the University's decision to require the examination should be objectively reasonable, nothing more. Mr. Kauffman's decision to obtain a third-party expert's

opinion as to whether Dr. Ellis was mentally impaired from doing her job—without disruption and in an effective, civil manner—was wholly reasonable based on the information provided to him. Accordingly, the Court should grant the University's motion for partial summary.

**III. RESPONSE TO PLAINTIFF'S OBJECTIONS TO EVIDENCE.**

Within her opposition papers filed in response to the University's motion, Dr. Ellis filed a separate document containing twenty objections to the University's evidence. *See* Plaintiff's Objections, Doc. 52. The Court should reject all of these objections as improperly filed. Under the Local Rules of the United States District Court for Northern District of California, a party filing an opposition to a motion may include evidentiary and procedural objections in her opposition papers. But those objections must be contained *within* the party's brief or memorandum and that brief or memorandum is limited to 25 pages in length. *See* the Court's Civil Local Rule, 7-3(a).[4] Here, Dr. Ellis's memorandum, lacking these objections, is at full 25 pages in length; her separately filed objections substantively run an additional 5 pages. Dr. Ellis should not be permitted to avoid the page limits mandated by this Court by filing objections in a separate document after she had reached the full number of pages allowed within her brief. The Court should therefore reject her objections as improper under its local rules.

Additionally, without waiving the above objection, Dr. Ellis's evidentiary objections are unfounded and should also be rejected on their merits. Defendant responds as follows:

**Objection 1**: Mr. Kauffman's notes are non-hearsay, as they are offered here not for the truth of the matters contained in the notes, but to establish what Mr. Kauffman was told during the May 19 meeting—which, as Dr. Ellis herself argues, is the part of the core question at issue in these motions: whether Mr. Kauffman's decision objectively reasonable. *See* FRE 801(c)(2). These notes show what he heard from the assembled participants and his declaration reflects this. *See* Kauffman Decl., Doc. 47-4, ¶ 3. Moreover, his role at the University and in the meeting, as

---

[4] "(a) Opposition. Any opposition to a motion may include a proposed order, affidavits or declarations, as well as a brief or memorandum under Civil L.R. 7-4. Any evidentiary and procedural objections to the motion must be contained *within* the brief or memorandum. Pursuant to Civil L.R. 7-4(b), such brief or memorandum *may not exceed* 25 pages of text." Local Rule 7-3(a) (emphasis added).

well as the fact that the notes were contemporaneously taken during the meeting show that the notes are admissible under two hearsay exceptions, Rule 803(1) (present sense impressions) and 803(6) (business records). *See* Kauffman Decl., Doc. 47-4, ¶ 3; *See also U.S. v. Arteaga,* 117 F.3d 388, 397 (9th Cir. 1997) ("statements offered for effect on hearer" . . . "circumstantial evidence of state of mind").

**Objection 2**: Mr. Kauffman's declaration at paragraph 6 is relevant under FRE 401 to show the purpose for which the examination is used by the University as an investigative tool to decide how to proceed with problematic employee conduct, which is directly at issue.

**Objections 3-7**: Mr. Kauffman's declaration at paragraph 7 and Dr. Henderson's declaration at paragraph 2 each demonstrates Dr. Henderson's and the University's understanding and practice in what information is disclosed to the University following an examination and what is otherwise tested by Dr. Henderson for employees such as Dr. Ellis; this goes to the issue of job-relatedness and is thus relevant under FRE 401.

**Objection 8**: Exhibit J includes emails that are non-hearsay under Rule 801 as they are not offered for the truth of the matters contained therein but instead discuss problematic behavior by Dr. Ellis that was communicated to Dr. Luby and which Dr. Luby was aware of at the May 19 meeting when he described problems he was encountering with Dr. Ellis to Mr. Kauffman. Mr. Kauffman's notes, referenced in Objection 1 above, reflect issues raised in Exhibit J.

**Objection 9**: Exhibit K is not introduced for the truth of the matters asserted but instead are to demonstrate what Mr. Kauffman was told during the May 19 meeting that formed his decision to require the examination—a question put at issue in the parties' motions here. The students' concerns and interactions with Dr. Ellis referenced in Exhibit K are identified by Dr. Luby in an email given to Mr. Kauffman during the May 19 meeting and these students were identified by name in that email. Kauffman Decl., Doc 47-5, Ex. A (AGO-1041 to 1042); Doc. 47-4, ¶ 2 ("I relied on the information in the emails, in part, to make the recommendation and decision to require that Dr. Ellis attend a mental fitness-for-duty examination."). Mr. Kauffman noted during the May 19 meeting such concerns raised about student complaints regarding Dr.

Ellis. *See* Kauffman Decl., Doc. 47-5, Ex. B. Thus, the emails in Exhibit K are admissible as non-hearsay under Rule 801.

**Objections 10-20**: The documents referenced in these objections are part of Exhibit A to Mr. Kauffman's declaration (a typo in Dr. Ellis's objection refers to it as Exhibit B). It is undisputed that this information was provided to Mr. Kauffman on or about May 19, and Mr. Kauffman has testified that he relied on the information contained in these emails, in part, to mandate that Dr. Ellis take the examination. Kauffman Decl., Doc. 47-4, ¶ 2 ("I relied on the information in the emails, in part, to make the recommendation and decision to require that Dr. Ellis attend a mental fitness-for-duty examination."). And the contents of the emails, such as those from students complaining about Dr. Ellis referenced in Objections 15, 16, 18, and 19, are further reflected in notes taken by Mr. Kauffman during the meeting regarding Dr. Ellis's performance and misconduct issues. *See* Kauffman Decl., Doc. 47-5, Ex. B. Thus, the information contained in the documents is not being offered for the truth of matters contained therein, but instead to demonstrate what information Mr. Kauffman relied on to decide to require the examination—an issue central to the party's dispute here. The documents are therefore non-hearsay under Rule 801 and should be admitted.

## CONCLUSION

The University's directive to Dr. Ellis to take a fitness-for-duty examination was lawful. The decision behind it was objectively reasonable and one that employers should be allowed to make in such contexts. The Court should therefore grant summary judgment.

Dated: July 1, 2016                              Respectfully Submitted,

                                                 KAMALA D. HARRIS
                                                 Attorney General of California


                                                 /s/ Michael D. Gowe
                                                 MICHAEL D. GOWE
                                                 Deputy Attorney General
                                                 *Attorneys for Defendant Board of Trustees*

OK2015900357, reply brief.doc

15